## McCORNICK v. LEVY.

No. 2040.   Decided January 7, 1910 (106 Pac. 660).

1. EVIDENCE — PAROL EVIDENCE — VARYING WRITTEN AGREEMENT. When parties have deliberately put their contract in writing, and there is no uncertainty as to the extent of their respective rights and obligations thereunder, it cannot be varied by showing a prior or contemporaneous oral agreement in conflict with and at variance with the written instrument, and hence evidence of a contemporaneous oral agreement not embraced in the terms of a note and mortgage was not admissible to show that they were to be paid in merchandise.   (Page 136.)

2. MORTGAGES—EXECUTION—FRAUD—EVIDENCE.   Evidence *held* to show that defendant executed a mortgage and note to plaintiff's bank without receiving any consideration under the misapprehension that she was securing a debt of her son's company to the bank, while in fact she was securing the debt of others to the bank; she being induced to do so by a fraudulent scheme of her son and plaintiff.   (Page 146.)

APPEAL from District Court, Third District; *Hon. C. W. Morse,* Judge.

Action by W. S. McCornick against Marie Levy.

Judgment for plaintiff. Defendant appeals.

REVERSED AND REMANDED FOR NEW TRIAL.

*Geo. W. Bartch* and *O. A. Murdock* for appellant.

*Henderson, Pierce, Critchlow & Barrette* for respondent.

McCARTY, J.

This is an action for the foreclosure of a mortgage. From a judgment entered in favor of plaintiff, defendant appeals.

The complaint recites that the mortgage was executed by defendant to secure the payment of her promissory note of even date therewith for the sum of $8421.28, and contains a prayer for a foreclosure and sale of the mortgaged property. Defendant in her amended answer admits the execution of the note and mortgage, but seeks to avoid their effect by alleging, among other things, that there was a contemporaneous and collateral oral agreement between plaintiff and defendant, in which plaintiff promised to accept in payment of the note and mortgage certain goods and merchandise as the same should be manufactured by the Sam Levy Cigar Company, a corporation engaged in the manufacture and sale of cigars, and that said goods and merchandise were tendered to plaintiff as the same were manufactured by the cigar company mentioned, and that plaintiff refused to accept the same, and that he thereby violated the terms of the oral agreement referred to and rendered the Sam Levy Cigar Company, for whose benefit, it is claimed, the note and mortgage were given, financially unable to pay either the principal or interest of the note and mortgage.

Much evidence was introduced on the issue tendered by these allegations of the answer. The court, in its sixth finding of fact, among other things, found "that the said note and mortgage were executed and delivered by defendant to plaintiff and were received by plaintiff in good faith and

without any agreement or contract expressed or implied upon the part of plaintiff other than is fully represented in the terms of said note and mortgage." Counsel for defendant contend that this finding of fact is wholly unsupported by the evidence, and is therefore erroneous. Notwithstanding the fact that they have devoted much space in their printed brief to the discussion of the questions presented by this assignment of error, we are of the opinion that the question of whether the allegations of the answer respecting the contemporaneous and collateral oral agreement were or were not sustained by the evidence is unimportant. The rule is elementary that, when parties have deliberately put their contract in writing, and there is no uncertainty as to the extent of their respective rights and obligations under such contract, it cannot be overturned nor varied by showing a prior or contemporaneous oral agreement which is in conflict with and at variance with the written instrument. This rule has been so often announced by text-writers, and so closely adhered to and universally followed by the courts, that it would seem to be a work of supererogation on our part to cite authorities in support of it. We think that this defense, presented, as it is, in the amended answer, is unavailing for any purpose, and a finding thereon by the court was unnecessary. The answer, which contains nearly twenty-eight pages of printed matter, is somewhat vague and uncertain as to the other defense which defendant has endeavored to set up. In the absence of a special demurrer or motion to make the answer definite and certain, we have decided to treat it, for the purposes of this appeal, as the parties themselves have treated it, namely, as charging fraud and fraudulent representations; and we are of the opinion that it also in effect alleges want of consideration.

The facts and circumstances leading up to and surrounding the execution of the note and mortgage, as disclosed by the record, are about as follows: On or about July 1, 1905, the Sam Levy Cigar Company, a corporation engaged in the manufacture and sale of cigars in Salt Lake City, Utah,

and which we shall hereinafter, for the sake of brevity, re-
fer to and designate as the "cigar company," was indebted
to plaintiff, who was and is doing a general banking business
under the name of McCornick & Co., Bankers, in the sum
of about $2500 on an overdraft which it had obtained at the
bank. The cigar company, which, the evidence shows, was
insolvent, also had other creditors, some of whom were in the
East. W. S. McCornick, the plaintiff, was and is the sole
owner and the general manager of the bank. When he was
absent, his son Henry McCornick took his place as manager.
The bank demanded payment of the overdraft, and J. R.
Levy, one of the defendant's sons and general manager of
the cigar company, called at the bank in response to the de-
mand and had a conversation with Henry McCornick, plain-
tiff being out of the city at the time, about the overdraft.
J. R. Levy testified—and his testimony on this point is not
contradicted—that he explained to Henry McCornick that,
"If the bank closed down on them, they would have to quit
entirely, . . . and the company would lose all it had,
and nobody would get any money . . . because the ci-
gar company had practically no assets;" that Henry McCor-
nick then asked him if the cigar company had more money
whether it "could pull through," and he (Levy) answered
that he thought it could; that it was there arranged between
them that the bank should advance $2500, and that he (Levy)
should take the money, go East and buy all the goods he
could on credit for the cigar company, and pay as little down
on the purchase price as the Eastern merchants would accept
and ship the goods, and, on his return, sell the goods for cash
as fast as possible and deposit the proceeds in plaintiff's
bank; that, in pursuance of this arrangement, he (Levy)
went East with $2500 and purchased all the goods in the
name of the cigar company he could get on credit, paying as
little money thereon as the merchants with whom he did the
business would accept; that the goods were consigned to the
cigar company and received by it in Salt Lake City, and
the greater portion thereof, within the next ensuing three

months, were sold by him (Levy) "for cash and at reduced prices, sacrifice prices," and the money deposited in plaintiff's bank to the credit of the cigar company; that the cigar company was not allowed to draw any money out of the bank to pay any of its Eastern creditors; that the cigar company issued checks against the account, but they were not honored by the bank. At the time it was arranged for Levy to go East and purchase goods, a telegram was prepared by him and Henry McCornick and sent to Mrs. Levy, defendant, who was in New York, asking her to guarantee the payment of the $2500 advanced to J. R. Levy to buy goods. Mrs. Levy, a few months prior thereto, had lost her husband, and, under the advice of her physicians, had gone to New York for the benefit of her health, which, because of her bereavement, had become very much impaired. The reply she made to the telegram is not in the record. We are therefore not advised what, if any, promise of guaranty was made by her.

Henry McCornick was called as a witness and interrogated by counsel for plaintiff concerning the transaction involving the $2500 advanced by the bank, and the terms and conditions, if any, upon which it was understood between him and Levy that the goods should be purchased in the East by Levy, and testified as follows: "Q. I want to be very brief about it. State whether or not it is a fact that you gave or loaned to Joe Levy $2500 for the purpose of going East to buy goods, instructing him to pay as little as possible, and get the goods back here leaving as much as possible to be due to the Eastern people from whom he bought. A. My recollection of the fact was, I think the account standing, $2500, $2700 overdrawn. Q. That is the Sam Levy Cigar Company— A. The Sam Levy Cigar Company had been trying for some time to get the matter straightened up, one way or the other. He came into the bank one morning and stated he needed $2500, or some such amount as that, but he wanted to buy more stock. Q. Now, did you arrange or agree with him, or instruct him in any manner, as to how he should buy goods, what he should do with the

$2500 ? A. I don't remember. He said he intended to buy goods. I wasn't sure at the time whether he wanted to use this money to buy goods. Q. You understand what I am getting at, whether there was any agreement of any kind between you, is so, state what it was, as to what should be done with the $2500, how he should buy goods, bring them on here, with only a small amount paid on them? A. Might have been something brought up with regards to the amount he would have to pay. Of course, I don't remember that."

It will be observed that Henry McCornick, notwithstanding counsel repeatedly called his attention to the alleged understanding between him and Levy respecting the terms and conditions upon which goods should be purchased in the East with the $2500, as testified to by Levy, did not deny there was such an understanding. The effect of his testimony on this point is rather a corroboration than a contradiction of Levy's testimony. Further, we think the subsequent transactions had with reference to the goods, to which transactions plaintiff was a party, also tend to corroborate the evidence of Levy. When the goods arrived from the East, as many of them as could be disposed of were sold by Levy at reduced prices, and the money deposited in plaintiff's bank. Plaintiff did not permit any of this money to be used to pay the debts incurred by the cigar company in the purchase of the goods, and when these debts commenced falling due plaintiff and J. R. Levy, in order to put the goods beyond the reach of the creditors of the company, entered into an arrangement by which the goods were sold by Levy to an ostensible innocent purchaser, who took possession of them and continued the business in his own name, the proceeds of which, less running expenses, he turned over to plaintiff. The transaction last referred to we shall hereafter refer to more in detail.

While in some of the subsequent transactions leading up to and culminating in the execution of the note and mortgage in issue a claim was made that Mrs. Levy could be held on her alleged guaranty, and while there are some expres-

sions in plaintiff's brief indicating a similar view, yet plaintiff's case was not predicated on the theory that Mrs. Levy had guaranteed the payment of the $2500 mentioned; nor is it contended that such guaranty was a consideration for the note and mortgage; nor is there anything legally claimed against the defendant on that account. A further answer to that claim is that, since the undisputed evidence tends to show that the $2500 was advanced by the bank to enable J. R. Levy to defraud Eastern merchants out of their goods for the mutual benefit of the plaintiff and the cigar company, the defendant was neither legally nor morally bound by the alleged guaranty. This was practically conceded by counsel for plaintiff during the progress of the trial, and in referring to this alleged transaction between Henry McCornick and Levy, as pleaded in the answer, they very properly characterize it as "a fraudulent and immoral transaction, fraudulent as to the creditors and certainly immoral." But counsel insist that this allegation of fraud is not supported by evidence. When the debts of the cigar company incurred in the purchase of the goods began to fall due, and payment thereof was being demanded, Levy went to plaintiff and informed him that if these bills were not paid the creditors would bring suit against the cigar company and take the goods. There is some conflict in the evidence as to what was said by the parties on that occasion. It does appear, however, that it was there decided that a sale of the goods should be made to one John Bass, an employee of the cigar company, and that sale of the goods was soon thereafter made to Bass. The goods were delivered to him in installments; the cigar company taking his note for the amount of each installment as the goods were delivered. The value of the goods thus sold and turned over to Bass was from $9500 to $10,000. When Bass got possession of them, he in turn gave plaintiff a chattel mortgage on them for $6000 to secure the payments of the notes which he had given to the cigar company in payment of the goods, which notes had been dis-

counted by the bank and the proceeds thereof placed to the credit of the cigar company's account with the bank.

There is some controversy as to whether these transactions between Levy, Bass, and the bank were had on the advice of plaintiff and in pursuance of a plan outlined by him, or at the request of J. R. Levy. We think, however, it is unimportant which of the two conceived the idea and suggested the plan by which the goods were sold and turned over to Bass. The record shows that each of them fully understood all the facts and circumstances under which the sale was made to Bass and expected to be mutually benefited thereby. The chattel mortgage executed by Bass to plaintiff, so far as material here, recites as follows: "For the purpose of obtaining the above loan I (Bass) represent that I am lawfully possessed of the said property herein described, and that the same is free from all incumbrances and liens whatsoever." Attached to the mortgage is the affidavit of the mortgagor and mortgagee, which reads as follows: "John Bass, mortgagor, and W. S. McCornick (plaintiff) mortgagee, being first duly sworn on their respective oaths, depose and say, each for himself, as follows: That he is a party to the within chattel mortgage, and that the same is made in good faith to secure the amount of indebtedness named therein and without any design to hinder or delay or defraud the creditors of said mortgagor." This affidavit was sworn to November 7, 1905. Counsel for plaintiff contend that, "as between the cigar company and Bass, the sale of the goods was a mere colorable one," but, they insist, that plaintiff, in the part he took in the transaction with Levy, on the one hand, and Bass, on the other, acted in good faith. Let this be as it may, the fact remains, however, as shown by the record, that plaintiff not only knew all the facts and circumstances leading up to and surrounding the sale of the goods to Bass, but was a material and necessary factor in the transaction, and that, without his assistance, the sale would never have taken place. For the purposes of this appeal we will assume that, as to this particular transaction, plaintiff not only acted in perfect

good faith with Bass, but with the cigar company also. Plaintiff's counsel, in their brief, say, and their statement of the facts on this point is fully supported by the record: "The (Bass) notes, . . . upon being discounted, went to the credit of the cigar company and amounted upon their face to sufficient to liquidate the indebtedness of the cigar company. In fact, in the aggregate, they amounted to more, and the cigar company withdrew by check from its account the overplus, not desiring to have its account show any funds in the bank to its credit. It appears from the testimony that the total amount of the notes of Bass so executed between October 23d and November 25th, and for which the cigar company got credit, was $7205.65. It further appears that this overpaid the amount of the indebtedness of the cigar company, for $1036 was drawn from this account by the cigar company and used in some manner. . . . It appears that on November 28, 1905, the cigar company had a credit balance of $53.87." Therefore, according to plaintiff's own contention, the debt of the cigar company to the bank was fully paid November 28, 1905, and, instead of the cigar company being indebted to the bank, the bank was owing the cigar company. In fact, this is the only conclusion consistent with plaintiff's claim that he acted in good faith in his dealings with Bass and the cigar company which is deducible from the facts in the case. In the meantime the creditors of the cigar company were sending in their bills and demanding payment, and, as stated by counsel for plaintiff in brief, "plaintiff and Joe Levy became alarmed lest the Eastern creditors should attach the goods in the hands of Bass and make trouble for him (Levy)."

It necessarily follows, from the facts and circumstances which we have briefly reviewed, that the creditors, by attaching the goods, would have made trouble for plaintiff, by involving him in a lawsuit, all of which, the record shows, he fully appreciated and was anxious to avoid. Levy testified that he informed plaintiff that, if the goods were not paid for within a specified time, the cigar company would be

forced into bankruptcy, as it "had absolutely no funds" with which to pay its obligations; that plaintiff offered to turn the goods held by Bass over to him and advance sufficient money to settle with the creditors of the cigar company at twenty cents on the dollar, provided he (Levy) could induce the creditors to accept that amount in full payment of their claims and give plaintiff a chattel mortgage on the goods to secure the payment of the money so advanced, including the Bass indebtedness to the bank, and also get his mother, Mrs. Levy, the defendant herein, to give a mortgage on her home as additional security; that he refused to consider the proposition at all; that a few days thereafter plaintiff again submitted to him the following proposition: "He (plaintiff) says, 'You are a young man and can go into business for yourself. . . . There is a big stock of goods down there, and you can handle them and pay me back any time. . . . If you will settle with the creditors for me, I will advance you thirty cents on the dollar to pay their accounts in full, . . . providing you will get your mother to give you a note and mortgage on her home; . . . and I will give you, make you a present of, $1500, if you will do this for me.'" Plaintiff testified that he made no such proposition to Levy, but that Levy came to him and stated that he wanted to get back the goods which had been turned over to Bass and sufficient money from the bank to settle with the creditors of the cigar company. We think it is unimportant from which side the proposition came. The evidence shows that, from this time on until the note and mortgage in issue were executed, both plaintiff and J. R. Levy worked to a common purpose, namely, to induce Mrs. Levy to mortgage her home and thereby enable Levy to get possession of the goods which had been turned over to Bass and to better secure the payment of the Bass indebtedness to the bank and relieve plaintiff from the legal complications which he had good reason to believe would arise should the creditors of the cigar company bring suit and attach the goods.

In January, 1906, plaintiff went to San Francisco, and during his absence Levy had some talk with Henry McCornick about obtaining money from the bank with which to effect a settlement with the Eastern creditors, and as a result each of them communicated with plaintiff in regard to the matter. On January 22, 1906, plaintiff wrote to Levy, and in the letter, among other things, he said: "Henry also telegraphed me that he understands the advance you asked for is to be considered as a gift, and that your mother is not to guarantee only our old account. Of course I cannot believe that he has this right, as I cannot understand why this amount needed to settle for the other creditors should be considered a gift. . . . Now, if we have to advance all this money I want your mother to give security on the lot you spoke of being under option of sale, and I have so written Henry. My advice is *that there is no question but your mother can be held under the guarantee that we have as well as the off chances in holding the goods under the mortgage.* However, I am anxious to have this matter settled on your account, as I am satisfied if not settled they will make it hard on you." (Italics ours.) It also appears from the evidence that Henry McCornick had in effect accused Levy of having obtained the $2500 first mentioned under false pretenses. Levy, because of these covert threats that were made by the McCornicks and the inducements which we think the record fairly shows were held out to him by W. S. McCornick of pecuniary advantage to himself, importuned his mother to execute a mortgage on her home in favor of plaintiff. At first she positively refused to consider the proposition, but was finally overpersuaded by her son to do so, and on February 9, 1906, she called at the bank and signed the note and mortgage which had been prepared by the bank some ten days before. (January 30, 1906.) J. R. Levy testified that when Mrs. Levy signed the note and mortgage plaintiff handed him a check for $1500, and stated: "Here is $1500. I will make you a present of this"—which he (Levy) accepted. Mrs. Levy testified to the same thing.

Plaintiff in his testimony denies this and explains the transaction as follows: "I made a present in this way. I threw off $1500. If he wants to call it a present, I guess it is about the same thing." Let that be as it may, the fact remains, as stated by counsel for plaintiff in their brief, that "the final arrangement was concluded and took the form of a transfer from John Bass to J. R. Levy of all the goods remaining in the hands of Bass." No further transactions were had in the name of the cigar company except the placing to its credit the money advanced by plaintiff to settle with its Eastern creditors, which was checked out by J. R. Levy for that purpose. In other words, J. R. Levy, with the assistance of plaintiff, got possession of the goods in his own name and went into business on his own account. The record shows that the Bass note and mortgage were not canceled by the bank until June 12, 1906, four months after the note and mortgage in issue were executed and delivered to plaintiff, showing that he claimed some interest in the goods for a considerable length of time after he obtained the note and mortgage from Mrs. Levy. Plaintiff also denied that he had sent Levy to his mother to induce her to give the mortgage in question. He admits, however, that he had some talk with J. R. Levy about getting his mother to give a mortgage. In fact, this is evident from his letter which he wrote to Levy from San Francisco hereinbefore referred to.

The undisputed evidence shows that Mrs. Levy was not a business woman, and had had but little, if any, experience in business matters; and that at the time she signed the note and mortgage she was under a nervous strain caused by the loss of her husband about a year before, and, according to her own testimony, which is not denied, she "was a physical wreck." And furthermore, the evidence, without conflict, shows that she was ignorant of the fraudulent transactions hereinbefore mentioned, commencing with the arrangement made and entered into between Henry McCornick and J. R. Levy, wherein the bank, according to the evidence of Levy,

which is not denied, advanced $2500 with the express under-standing that it should be used by Levy to defraud Eastern merchants out of their goods, and culminating in what we think the evidence shows to be an arrangement between the plaintiff and defendant's unnatural son to induce defendant to execute the note and mortgage to secure, not an indebted-ness of the cigar company, which she believed she was secur-ing, but to secure the indebtedness of others. It is alleged in the answer, and, as we have stated, we think it may be fairly inferred from the evidence, that at the time Mrs. Levy signed the note and mortgage she believed she was securing a debt owing by the cigar company to the bank. In her testimony she says, referring to the several transactions be-tween J. R. Levy, plaintiff, and John Bass, herein referred to: "I know nothing about these preliminary matters my son testified to." And there is nothing in the record which tends to contradict her statement on this point. She had not been advised, nor did she know, that the debt of the cigar company to the bank had been paid, and that J. R. Levy, her son, had in effect sold her out. All of these matters were concealed from her at the time she signed the mortgage, and both plaintiff and J. R. Levy must have known that she signed it under a misapprehension of the facts and circumstances leading up to and surrounding the transaction, because the record shows that when she signed the note and mortgage there was nothing owing by the cigar company to the bank. The effect of the transaction was to relieve Bass from all liability and shoulder the debt onto Mrs. Levy, who did not, either directly or indirectly, receive any consideration therefor or benefit therefrom. Nor did she know that she was assuming Bass' obligations, but, on the contrary, was led to believe that she was, as heretofore stated, securing the payment of a debt owing by the cigar company to the bank.

We are of the opinion that the sixth finding of fact made by the trial court is not only unsupported by, but is contrary to, the evidence. The finding is as follows: "That the said

note and mortgage were made, executed, and delivered by the defendant to the plaintiff for the purpose of securing a portion of certain indebtedness then and there due and owing from the Sam Levy Cigar Manufacturing Company, a corporation; and, in consideration of the execution and delivery of the said note and mortgage, the said plaintiff released and discharged the said indebtedness then and there owing by said Sam Levy Cigar Manufacturing Company to plaintiff; that the said note and mortgage were executed and delivered by defendant to plaintiff and were received by the plaintiff in good faith and without any agreement or contract, expressed or implied, upon the part of plaintiff other than is fully expressed in the terms of said note and mortgage; and the said plaintiff was not guilty of any fraud or deception or want of fair dealing in the negotiation with defendant which led up to or resulted in the giving of said note and mortgage or in any manner connected therewith."

The judgment is reversed. In view of the indefiniteness of the allegations of defendant's answer upon which she bases her defense, and because of which the plaintiff may have failed to introduce explanatory evidence, we have decided not to direct findings and judgment, but to remand the cause for a new trial, with directions to the lower court to permit the parties to amend their pleadings should they be so advised. Each party to pay his own costs on this appeal.

STRAUP. C. J., and FRICK, J., concur.