## McCORNICK v. LEVY.

No. 2155. Decided September 15, 1911 (118 Pac. 558).

MORTGAGES—EXECUTION—FRAUD—DURESS—EVIDENCE. In a suit to
foreclose a mortgage, evidence *held* to warrant a finding that
defendant had not been induced by fraud or duress to execute
the same.

APPEAL from District Court, Third District; *Hon. C. W. Morse,* Judge.

Action by W. S. McCornick against Marie Levy.

Judgment for plaintiff. Defendant appeals.

AFFIRMED.

See, also, 37 Utah, 134, 106 Pac. 660.

*G. W. Bartch* and *O. A. Murdock* for appellant.

*Henderson, Pierce, Critchlow & Barrette* for respondent.

McCARTY, J.

This action was brought to foreclose a mortgage given to secure the payment of a promissory note. The complaint is in the usual form for the foreclosure of a mortgage. The defendant, in her answer, admits the execution of the note and mortgage, but alleges that at the time "she was in a weak condition physically, and her system had been wrecked by weakness and nervousness and sickness," and that plaintiff, taking advantage of her weak condition, and by making certain false and fraudulent representations (set out in the answer), induced her to execute the note and mortgage. A cross-complaint was interposed, which alleges want of consideration, and reiterates the charge of fraud and misrepresentation contained in the answer. The relief sought by her is a cancellation of the note and mortgage. Judgment was rendered in favor of plaintiff.

The cause has been tried twice, and this is the second appeal taken by the defendant. The opinion rendered by this court on the former appeal is reported in 37 Utah, 134, 106 Pac. 660. The issues presented and the relief sought are practically the same as at the first trial. By an examination of the former opinion, it will be seen that the cause was reversed because the facts pleaded by defendant in her answer and cross-complaint upon which she based her prayer for equitable relief were, as we then thought, and as we still

think, fully established on the former trial by the testimony given by the defendant and her son, J. R. Levy, which testimony was corroborated, rather than contradicted, by the meager evidence introduced by plaintiff on that issue. In view of the fact that the evidence introduced both by defendant and plaintiff at the last trial on the equitable issues presented by the pleadings not only warrants but impels us, in disposing of the cause, to arrive at a different conclusion, it becomes necessary for us to make a somewhat detailed statement of the facts leading up to and surrounding the execution of the note and mortgage as the same appear from the record presented on this appeal.

The Sam Levy Cigar Company, hereafter referred to as the cigar company, was incorporated under the laws of this state July 27, 1895, with a capital stock of 200 shares, at the par value of twenty-five dollars per share. The company was engaged in the business of manufacturing and selling cigars in Salt Lake City, Utah, and was founded by Sam Levy, defendant's husband, who died in October, 1904. Defendant was a stockholder and a director in the company from the time of its organization. She owned fifty shares, one-fourth of the stock. When Sam Levy died, defendant's son, J. R. Levy, who was living at home with defendant, became manager of the business. For about a year prior to June, 1905, the cigar company was indebted to plaintiff, who was and is doing a general banking business, on an overdraft which it had obtained at his bank. About the latter part of June, J. R. Levy, in pursuance of numerous demands made by the bank on the cigar company for the payment of the overdraft, called at the bank and informed Henry McCornick, plaintiff's son, who was temporarily in charge of the bank, that the cigar company was indebted to parties other than the plaintiff, and that it could not pay the overdraft, and if pressed for the money it would lose everything, and no one would get anything. At this time the overdraft amounted to $3230.25. Levy explained that the company had a lot of goods on hand which consisted of "broken stock,"

which was worthless, because of the lack of other material necessary to work it up; that the goods on hand cost several thousand dollars, and that if the company could obtain more money with which to purchase more stock it could go on with the business, make more money, and eventually pay all of its obligations. Henry McCornick finally agreed to advance the company $2500, provided Mrs. Levy, who at that time was temporarily absent in New York, would guarantee the payment of the indebtedness of the cigar company to the bank, including the $2500 requested. A telegram was sent to Mrs. Levy, asking her if she would guarantee the account of the cigar company. This telegram was received by defendant, and answered in accordance with her wishes that she was willing to guarantee the indebtedness. On faith of this reply telegram Henry McCornick prepared a written guaranty on a form used by the bank, and handed it to J. R. Levy, who sent it to defendant for her signature. Mrs. Levy received it. Instead of signing it so as to make it her personal guaranty, as contemplated by J. R. Levy and Henry McCornick, she returned it signed, "Sam Levy Cigar Mfg. Co., by Marie Levy, President." In the meantime, plaintiff loaned the $2500 requested by J. R. Levy by permitting the cigar company to overdraw its account in the additional sum of $2500, thereby increasing its indebtedness to $5730.82. The excuse given by Mrs. Levy in her testimony why she did not guarantee the debt personally as she had expressed a willingness to do in her telegram, on the faith of which plaintiff loaned the $2500 mentioned, was that she had changed her mind. J. R. Levy went East with the $2500 advanced the cigar company by plaintiff, and was enabled to obtain, and did obtain, for cash and on credit, about $10,000 worth of goods. These goods were shipped to, and were received by the cigar company.

When this case was tried the second time, J. R. Levy was beyond the jurisdiction of the court, and his testimony given at the former trial was read in evidence. He testified that immediately after the receipt of the goods by the cigar company he, in pursuance of an understanding had with

Henry McCornick at the time he obtained the loan of $2500
for the company, disposed of the goods as rapidly as possible
"for cash at reduced prices, sacrifice prices," and deposited
the money in plaintiff's bank to the credit of the cigar com-
pany; "that this took possibly about three months;" that the
cigar company was not permitted to draw any money from
the bank to pay its Eastern creditors; that checks were issued
against the account, but were not honored by the bank. The
books of the bank, containing the account of the cigar com-
pany, the correctness of which is not disputed, show that
from July 8 to November 1, 1905, the time during which
Levy claims he was selling goods "at reduced prices, sacrifice
prices," and depositing the proceeds of the sales in plain-
tiff's bank, the indebtedness, the overdraft, of the cigar com-
pany at the bank was increased from $5674.27 to $6125.92,
and that during this period of nearly four months not one
cent was paid in, deposited to the credit of the cigar com-
pany, to reduce the amount of its indebtedness, but, on the
contrary, the overdraft was increased $452.65. Further-
more, plaintiff and Henry McCornick both testified that
during this time the cigar company did its banking business
with another bank, and that no money was deposited in plain-
tiff's bank to the credit of the cigar company.

Considerable evidence was introduced, none of which was
denied, tending to show that J. R. Levy's reputation for
truth and veracity in the community where he has resided
practically all his life was bad. While counsel for defend-
ant do not admit that his testimony should be rejected as un-
worthy of belief, unless corroborated by other evidence, they
do say in their printed brief: "We repudiated him in our
former brief; we repudiate him again in our brief on this
appeal. . . . It is too well known for argument that
a thoroughly honest and dutiful son would never lend his
influence to perpetuate a wrong upon his mother." And
they further say that "the only redeeming feature in his fa-
vor is his youth." (The record shows that he was about
twenty-five years of age at the time the mortgage was exe-
cuted.) The trial court was therefore not only justified in

holding that his statement that he deposited money in plaintiff's bank to the credit of the cigar company, which it was not permitted to draw upon to pay its Eastern creditors, was untrue, but was fully warranted in holding that his testimony, relating to the same subject-matter, and referred to in our former opinion (37 Utah, 134, 106 Pac. 661), wherein he in effect charged Henry McCornick with having entered into a conspiracy with him to swindle Eastern merchants out of their goods, was a pure fabrication. In fact, he was so thoroughly impeached that the trial court would have been justified in rejecting his testimony on every material point, where it was not corroborated by other evidence, as unworthy of belief.

When the debts incurred by the cigar company in purchasing goods began to fall due, and Eastern creditors were demanding the payment of their accounts, Levy, in order, as he supposed, to put the goods beyond the reach of the creditors, turned the entire stock over to one John Bass, who was an employee and also a director of the cigar company. The goods were delivered to Bass in installments. He gave his promissory note in favor of the cigar company for each installment as the goods were delivered. The value of the goods delivered to Bass under this arrangement was from $9500 to $10,000. When Bass got possession of the goods, he gave plaintiff a chattel mortgage on them for $6000, to secure the payment of the indebtedness represented by the notes which he had given to the cigar company in payment for the goods. These notes had been discounted by the bank, and the amount thereof, less the discount, placed to the credit of the cigar company, which more than paid its indebtedness to the bank. The cigar company was permitted to and did draw from the bank sums of money which in the aggregate were equal to its credit balance. From this time on until the execution of the note and mortgage in question, the business was carried on in the name of Bass, who did the banking of the concern with plaintiff's bank. Bass soon had an overdraft at the bank which kept increasing until January 26, 1906, when it amounted to $1624.48.

Counsel for defendant contend with much earnestness that the only inference fairly deducible from the evidence is that the transfer of the goods to Bass was made in pursuance of a scheme entered into by McCornick, J. R. Levy, and Bass to defraud the cigar company out of its property and to ultimately mislead defendant as to the true status of the goods, and then, by fraudulent representations induce her to execute the note and mortgage in question. Under the facts as presented by this appeal, we fail to see in what way the turning of the goods over to Bass tended to mislead defendant, or in what way the transaction was fraudulent as to her or her interests. Counsel for defendant, however, seem to consider the transaction of vital importance, and have devoted considerable space in their printed brief to the discussion of the assignment of error presenting this question. We shall therefore briefly consider that phase of the controversy, and refer to a few facts and circumstances which we think conclusively show that defendant's interests were in no way prejudiced or injured by the transfer of the goods to Bass, and that such transfer was no part of any scheme of the parties mentioned to ultimately induce her to execute the note and mortgage in suit.

Before referring to the evidence on this point, we invite attention to the relation that J. R. Levy bore to defendant, in a business sense, in this and the other transactions to which we have referred. Defendant called members of her family, who testified that she had "implicit confidence in her son Joe" (J. R. Levy) and relied upon him in business transactions; "that when Joe Levy asked her to sign an instrument she would do so without looking at the instrument, or knowing anything about what the instrument contained." Mrs. Levy, defendant, testified that prior to the first trial of this cause she had "full confidence" in her son, J. R. Levy, and that "Joe took possession of the (cigar) business after his father died. . . . I left that all to Joe. Joe had everything to do with it. He took possession of everything when his father died. . . . I never took any interest in it—never paid any attention to it." It is there-

fore established that defendant, as a stockholder and director
of the cigar company, delegated whatever power and au-
thority she possessed to act for the company in the manage-
ment of its business affairs to J. R. Levy.

Counsel for defendant, however, assert that Mrs. Levy
was made president and director of the company without her
consent or knowledge, and that this was accomplished
through the fraud of plaintiff and J. R. Levy. In the course
of their printed argument, they say: "It seems, now that
the purchase of goods in New York had been determined by
them, they deemed it necessary, in maturing this fraud, to
have directors, and  .  .  .  papers purporting to be the
oaths of office, as directors, of J. R. Levy, John Bass, and
M. E. Levy, were filed in the office of the county clerk in
Salt Lake City on the 1st day of July, 1905, one day after
the $2500 had been advanced to purchase the goods in New
York," and that therefore any apparent neglect or inatten-
tion on her part as an officer of the company ought not to
militate against her in this action. We have examined the
record with the utmost care, and fail to find any evidence
whatever from which it can be inferred that either W. S. or
Henry McCornick had anything to do with having Mrs.
Levy, J. R. Levy, and John Bass, or any of them, become
directors of the cigar company. In fact, the evidence, with-
out conflict, shows that neither plaintiff nor any agent of
his had anything to do with making either of the parties
mentioned a director of the company. Mrs. Levy became a
director at the time the company was organized, July 27,
1895. It seems that she was re-elected or appointed director
in June, 1905. When her oath of office as director (the one
referred to by counsel) was filed in the office of the county
clerk, neither plaintiff nor Henry McCornick had ever seen
her or communicated with her. And the record also shows
that neither plaintiff nor Henry McCornick ever saw or heard
of John Bass until some four months after he was made di-
rector.

The evidence, except that given by J. R. Levy himself,
shows that he entered into the several transactions referred to,

including the transfer of the goods to Bass, for the purpose of furthering his own interests and the interests of the cigar company, and not for the purpose of benefiting the plaintiff and advancing his interests at the expense of defendant and the cigar company, as counsel for defendant seem to contend. Bass was in possession of the goods from about November 2, 1905, until the execution of the note and mortgage in question, a period of about three months. During this time, he permitted the cigar company to draw out of the business about $2325. This was done by Bass issuing checks on plaintiff's bank in favor of the cigar company, which were paid by plaintiff through his bank. The cigar company also obtained $1036 by discounting the Bass notes, making a sum total of $3361 which it drew out of the business and used in some manner. And if the testimony of J. R. Levy is to be believed plaintiff, at the time of the execution of the note and mortgage, gave him $1500, which went into the fund of the cigar company, making $4861 in the shape of dividends which the cigar company realized from the business during the three months Bass was in charge of it. On the other hand, the indebtedness to plaintiff growing out of this cigar business had increased more than $450. It is therefore idle to contend that plaintiff profited by the turning of the goods over to Bass at the expense of either the defendant or the cigar company. Furthermore, at the time Bass came into possession of the goods, the proposition of Mrs. Levy giving a mortgage on her property to secure the debt of the cigar company to plaintiff, or any other debt growing out of or connected with the business, had not been mentioned; and there is nothing in this record to show that such a thing had ever been thought of by any of the parties to the transaction.

Some time in January, 1906, another firm was formed, known as J. R. Levy & Bro. It was composed of J. R. Levy and his brother, Harold Levy, and was organized for the purpose of succeeding to and taking over the business of the cigar company. J. R. Levy testified that it was created in pursuance of suggestions made by plaintiff to him to go into business for himself. Plaintiff emphatically denied that he made

any such suggestion, or that he had anything to do with the creation of the firm. It is unimportant, however, which of the two conceived the idea. The new firm commenced doing business with plaintiff January 16, 1906, by making a deposit of $785 in his bank. In the meantime, the creditors of the cigar company were demanding payment of their accounts and threatening to commence proceedings against the cigar company to have it declared a bankrupt, unless some satisfactory arrangements were made for the payment of their claims. J. R. Levy testified: "I reported it to W. S. McCornick if the goods were not paid for within a certain length of time they (the creditors) would throw the company into bankruptcy, and that the Sam Levy Cigar Manufacturing Company had absolutely no funds;" that McCornick advised him to make an effort to settle with the creditors for twenty or thirty cents on the dollar. McCornick denied that he gave any such advice, but claimed that the proposition came from Levy, who claimed that he could settle with the creditors for twenty cents on the dollar, and wanted McCornick to advance the money with which to make the settlement; that he (McCornick) expressed a willingness to advance the money, provided Levy would furnish him good security for all existing indebtedness to his bank growing out of the cigar company's business, including the Bass overdraft and the money required to settle with other creditors; that Levy assured him that if he would advance this money defendant would secure the payment of the entire indebtedness by giving a mortgage on certain real estate owned by her. Soon thereafter (January 22, 1906) J. R. Levy sent a telegram, of which the following is a copy, to plaintiff, who was in San Francisco, Cal.: "Require thirty-five hundred. Have had bankruptcy postponed few days. Wire Henry if you want to give me money." In answer to this telegram, plaintiff wired Levy as follows: "Have wired Henry to await letter of this date." On January 22, 1906, plaintiff wrote to Levy, and, among other things, said: "Henry telegraphs me that you claim that I agreed to advance thirty cents on the dollar. This is not true, as you only talked twenty cents to me, and that

$9000 would cover the amount that you owed outside of me, which would have been $1800 instead of $3500 as you now have it, and if it had been but $9000 at thirty cents would have amounted to $2700 instead of $3500. Now, if you have to advance all this money, I would want your mother to give security on the lot you spoke of being under option of sale, and I have so written Henry." We think it may be fairly inferred from the contents of this letter, especially when considered in connection with McCornick's evidence, that Levy had made certain representations to McCornick before he went to California, and that Levy had given him some assurance that defendant would give security upon certain real property owned by her for the money owing by the cigar company in case the advances asked for were made.

Plaintiff returned from California some time in the latter part of January. Levy testified that he called to see him, and that he (McCornick) promised to give him $1500 if he would get defendant to secure the indebtedness mentioned. Plaintiff's version of the transaction respecting the $1500 is that Levy said to him that the other creditors of the cigar company were throwing off a part of what was owing to them, and that he (McCornick) ought to do the same thing, which he promised to do. Assuming that this was a material point in the case, we are clearly of the opinion that the trial court, in view of the time and manner in which this part of the transaction was carried out, as shown by the record, was fully warranted in accepting as true plaintiff's version of it. A note and mortgage covering the entire indebtedness, less the $1500 mentioned, were prepared by plaintiff's attorneys. A few days thereafter defendant, in company with her son, J. R. Levy, called at the bank, and defendant, in the presence of plaintiff, J. R. Levy and several of the bank employees, executed the note and mortgage. The different items merged into the note signed by defendant were as follows: Four notes of John Bass remaining unpaid, amounting to $4829.80; the Bass overdraft of $1624.48; and $3467 placed to the credit of the cigar company by plaintiff with which to settle with its other creditors, whose claims aggregated more

than $9000. J. R. Levy & Bro. immediately after the execution of the note and mortgage took possession of the goods, the value of which was about $10,000. No claim is made that plaintiff ever saw or talked with Mrs. Levy before she appeared at the bank to sign the note and mortgage. In fact, the record affirmatively shows that plaintiff never had any personal communication with defendant before that time. Two installments of interest of $147.37 each were paid on the note, and on September 13, 1906, a payment of $1000 was made on the principal. Later, on October 30, 1906, nine months after the note and mortgage were executed, another installment of interest ($147.37) was paid. Up to this time, no claim was made by defendant, or by any one in her behalf, that she had been imposed upon by plaintiff and induced through fraudulent misrepresentations to sign the note and mortgage, or that she did not fully understand and approve of the entire transaction. At the time the note and mortgage were executed, defendant gave plaintiff other and additional security for the payment of the debt, which it is unnecessary for us to refer to in detail. On February 8, 1906, defendant gave plaintiff a written order on Walker Bros., bankers of this city, for certain sums of money covered by this security. This writing, so far as material to this case, is as follows: "Referring to the escrow which you hold from myself to F. W. Little, you are hereby authorized and requested to pay over to McCornick & Company, bankers, this city, all sums of money paid to you thereunder, or to deliver to them any notes which Mr. Little may give to you to apply on said escrow."

On May 16, 1906, defendant wrote to plaintiff regarding this same subject-matter as follows: "With reference to the two notes of Frederick W. Little dated May 9, 1906, for $2666.66 each, in your favor, which you procured from him and which is secured by a mortgage on a certain piece of property sold to him by me, the above being in accordance with an agreement entered into between yourselves and myself, and which notes I have arranged with the Ut. Savings & Trust Co. to discount, there will be $500 excess from the proceeds of said discount, the Utah Savings & Trust Co. retaining the

balance to clear a mortgage on my South Temple Street prop-
erty.  This $500 I desire and hereby authorize you to place
to the credit of J. R. Levy & Bro. with you.  When they re-
lease the above-mentioned mortgage, the mortgage which I
gave to you some time ago on the same property will then be-
come a first mortgage."

Plaintiff received the $500 mentioned in the foregoing let-
ter, and, instead of retaining and applying it upon the note
and mortgage, as he had a right to do under an agreement he
had with Mrs. Levy, as shown by the record, he complied with
her request and placed the amount to the credit of J. R. Levy
& Bro.  The payments made on the note and mortgage, and
the transactions last referred to, are significant, because they
not only tend to show that defendant was advised of the na-
ture of the indebtedness which the note and mortgage were
given to secure, but knew of the transfer of the goods from
Bass to J. R. Levy & Bro.  Some time in February, 1907,
more than a year after the note and mortgage were given, J.
R. Levy called at the bank and requested plaintiff to lend him
$1000.  This plaintiff refused to do.  Immediately there-
after Levy wrote plaintiff a letter, and, among other things,
said: "I regret to inform you that it will be impossible for
us to pay any more interest or principal on the mortgage
given you by my mother.  . . . I would ask you to cancel
the mortgage you hold on my mother's homestead." This was
the first intimation plaintiff received that Mrs. Levy intended
to repudiate the note and mortgage.  We think it may be
fairly inferred from the record, when considered in its en-
tirety, that, if plaintiff had made the loan asked for by J. R.
Levy, and made other advancements of moneys to the Levys
whenever they became financially embarrassed, as he had
done in the past, no question would have been raised, either
by J. R. Levy or Mrs. Levy, as to the legality of the note and
mortgage.

Mrs. Levy, in support of her claim that she was induced to
execute the note and mortgage under the influence of fraud
and misrepresentation, testified that while she was in a very
weak condition physically, and under a nervous strain caused

by the death of her husband, which occurred about a year be
fore, J. R. Levy represented to her that plaintiff had sent
him to induce her to give the note and mortgage, with as-
surance that she would never be called upon to pay the debt,
and that the mortgage would never be foreclosed; that the
first time he spoke to her about giving a mortgage she posi-
tively refused to consider the proposition; that he kept on im-
portuning her to give the mortgage, and that she finally con-
sented to do so. On cross-examination, she admitted that be-
fore she called at the bank to execute the note and mortgage
J. R. Levy represented to her that by giving the mortgage and
paying off the debts of the cigar company it would come into
possession of about $10,000 worth of goods, which would be
sufficient to pay the note and mortgage, and that she would
never be called upon to pay the debt, because the cigar com-
pany could pay it. Quoting: "Q. And you wanted the
debts of the Sam Levy Cigar Company paid . . . or se-
cured, didn't you? A. Sure. . . . I wanted to secure
the Sam Levy Cigar Manufacturing Company debt." As we
have pointed out, Mrs. Levy, by giving the mortgage, enabled
the cigar company to pay off its debts, which amounted to
about $10,000. We think it also clearly appears from Mrs.
Levy's testimony that she understood that the new firm of J.
R. Levy & Bro. was organized to carry on the business of the
cigar company. On cross-examination, she testified on this
point in part as follows: "Q. They went into business on
this same stock of goods that Sam Levy Cigar Manufacturing
Company had, didn't they? A. I suppose so. I don't know.
. . . Q. I know you don't know. That was your un-
derstanding? A. I suppose so; yes. Q. That was your
understanding of it at the time, was it not, Mrs. Levy? They
went in as successors of the business of Sam Levy Cigar
Manufacturing Company, and took the stock of goods, and
went on in business with it, didn't they? A. I think they did.
. . . Q. And that business of J. R. Levy was the busi-
ness he was carrying on as the successor of the Sam Levy
Cigar Manufacturing Company, as you have told us, wasn't
it—you say, 'Yes,' don't you? A. Yes."

Regarding the alleged helpless situation in which it is claimed Mrs. Levy was at the time she gave the note and mortgage, because of her weak physical condition and her lack of experience in business matters and transactions of the kind under consideration, we remark that the evidence shows that Mrs. Levy, prior to the giving of the note and mortgage in question, had taken part in and was a party to quite a number of transactions similar to the one here involved. Since the commencement of this action, she gave a second mortgage on the property covered by the mortgage in suit. The details of some of this transaction were gone into on the trial of this case, and we think it was shown that she was sufficiently familiar with business matters of this kind to understand the significance of giving notes and mortgages, and the obligations incurred thereby. Furthermore, in this case she seems to have been alert to her own interests whenever asked to become a party to a transaction connected with or growing out of the cigar company's business. When her son, J. R. Levy, sent her the telegram, asking her if she would guarantee the debt of the cigar company, he received a telegram in reply that she "was willing." True, Mrs. Levy testified that her son-in-law sent the telegram without her knowledge, but she admitted that when a copy of the telegram was shown her she approved of it. Later on, after her son had obtained from the plaintiff a loan of $2500 on the strength of her telegram, Mrs. Levy personally sent another telegram, informing her son that she would not guarantee the payment of the debt mentioned. When Mrs. Levy received the writing sent to her for her signature, personally guaranteeing the payment of the debt, instead of signing the document, making it her personal guarantee, she, as we have stated, signed it, "Sam Levy Cigar Mfg. Co. by Marie Levy, President." It is therefore apparent that in this transaction she proved to be both physically able and mentally capable of safeguarding her own interests. And it also appears that upon that occasion she recognized, notwithstanding her sweeping denials to the contrary, that she was an officer of the cigar company, and as such was willing to do business with plaintiff for and in the

name of the company by having it guarantee the payment of its own debt. Moreover, when J. R. Levy first spoke to defendant about giving the mortgage in question, she, according to her own testimony, absolutely refused to consider the proposition at all, and would not deign to even discuss the matter with him. Her son, however, kept on importuning her to give a mortgage, and she finally consented to do so, but not until her son had explained to her in detail the purpose of the mortgage and the benefits which he claimed the cigar company would derive therefrom. When Mrs. Levy appeared at the bank and was in the act of executing the note and mortgage, she spoke of what she was doing, and characterized the act as a "terrible thing," showing that she understood the transaction and fully appreciated the consequences that might result to her in case default should be made in the payment of the debt secured thereby.

We are of the opinion that the judgment should be affirmed. It is so ordered. Costs to be taxed against appellant.

FRICK, C. J., and STRAUP, J., concur.