COMBINED METALS, INC., et al. v. BASTIAN et al.

No. 4362.    Decided March 12, 1928.    Rehearing Denied June 4, 1928.
(267 P. 1020.)

*Badger, Rich & Rich* and *John F. Bowman,* all of Salt Lake City, for appellant.

*W. I. Snyder, Dan B. Shields,* and *Herbert Van Dam, Jr.,* all of Salt Lake City, for respondents.

*J. Louis Brown,* of Salt Lake City, for defendants.

STRAUP, J.

This case was heretofore considered by this court and an opinion rendered and filed November 5, 1926, affirming the judgment of the court below. Thereafter a rehearing at large was granted. The case was thereupon reargued and resubmitted. As a conclusion is now reached by us reversing the judgment, the prior opinion is recalled and this substituted in lieu thereof and as the opinion in the cause.

The Combined Metals, Incorporated, a mining corporation, and J. C. Jensen, the respondents and the plaintiffs below, brought this action against Gearsen S. Bastian, the appellant and the principal defendant and cross-complainant in the court below, to cancel and rescind a contract entered into between them.

The plaintiffs pleaded only what they regarded the substance of the contract. The material parts of the complaint are that on or about May 24, 1921, the plaintiffs entered into a contract with Bastian, by the terms of which Bastian agreed to sell and deliver to plaintiffs 335 shares

of the capital stock of the Idaho State Bank of Twin Falls, in consideration of which the plaintiffs agreed to sell and deliver to Bastian 85,000 shares of the capital stock of the metals company; that before the "consummation of the contract" Bastian was notified that an assessment of 50 per cent of the par value of the bank stock had been levied, whereupon the parties agreed to a modification of the contract, by the terms of which the plaintiffs agreed to pay the assessment of the bank stock, and in consideration of that Bastian agreed to accept 51,500 shares of the capital stock of the metals company, provided he purchased an additional amount of 42,718 shares, he to make payment therefor by sale and transfer to the plaintiffs of a promissory note held by him and executed by the Pioneer Sugar Company of the face value of $21,454.75, Jensen to purchase from Bastian 15,000 shares of such stock of the metals company at 50 cents a share, payment therefor to be made by Jensen transferring to Bastian an equity which he had in and to a residence in Salt Lake City together with furniture therein contained, the value of which real estate was agreed to be $11,500, $7,049 of which was still owing by Jensen to the owner of the legal title payable in monthly installments of $125, and which Jensen agreed to pay until the unpaid purchase price was reduced to $4,000; and that thereafter, and on June 1, 1921, the agreement was still further modified, whereby it was agreed that the metals company was to transfer and deliver to Bastian 80,000 shares of the capital stock of the metals company; that Bastian represented to the plaintiffs that he was the owner of the bank stock and of the Pioneer Sugar Company note; that the market value of the bank stock was $125 a share; that the Pioneer Sugar Company was "financially responsible"; and that its note was secured by chattel mortgages—which statements, it was alleged, were untrue, but were relied on by plaintiffs.

They further alleged that Bastian acquired the bank stock and the sugar company note and other notes and securities

from Ernest R. Woolley, in consideration of which Bastian conveyed to Woolley a ranch in Salt Lake County; learning that the bank stock and sugar company note and other securities received by him from Woolley were valueless, Bastian, January 3, 1922 (long after he had transferred and delivered the bank stock and sugar company note to plaintiffs), commenced an action against Woolley, wherein it was alleged by Bastian that the sugar company note and the bank stock were valueless, that he still held and retained such note and stock, sought a rescission and cancellation of the contract with Woolley, offered to return to Woolley the bank stock and note and other securities received from him, and demanded a reconveyance of the ranch; that a settlement was made by and between Bastian and Woolley, whereby Woolley agreed to and did convey the ranch back to Bastian and all property which Woolley had received from him, and that Bastian agreed to return and deliver back to Woolley all property and securities which Bastian had received from Woolley, except the bank stock, which was not required to be returned because it was valueless, and excepting the sugar company note, which could not be delivered to Woolley because the note was in the hands of the plaintiffs and could not be released by them to Bastian because of writs of garnishment upon plaintiffs against Bastian whereupon Bastian by writing made an assignment in trust for the benefit of Woolley assigning and transferring all right, title, and interest which Bastian had in and to the note; and because thereof, it is alleged, Bastian rescinded his contract with plaintiffs and put it out of his power to pass good title to the sugar company note to the plaintiffs in accordance with the contract entered into between him and the plaintiffs; and that thereafter Woolley assigned and transferred the assignment to George E. Sanders.

It is further alleged that the 80,000 shares of the capital stock of the metals company were not issued to Bastian; that Bastian took possession of the Jensen residence in ac-

cordance with the agreement; that a foreclosure was had and the premises sold for unpaid installments of the original purchase price, but which was not due to the neglect or default of Jensen.

The plaintiffs thus prayed that the contract entered into between them and Bastian be rescinded and canceled; that they be relieved from all obligations to deliver the 80,000 shares of the capital stock of the metals company, or any part thereof, to Bastian; that they be adjudged the owners of the whole thereof; and that the court make such disposition of the sugar company note in plaintiffs' hands as might be agreeable to equity.

Special and general demurrers were interposed to the complaint by Bastian and a motion to strike portions thereof, especially the transactions as alleged between Bastian and Woolley, which demurrers and motion were overruled. Thereupon Bastian answered and filed a counterclaim, whereby he admitted that a contract was entered into between the plaintiffs and himself and set up the contract haec verba. It is as follows:

"June 1, 1921.

"I agreed first with Mr. Bastian, May 24, 1921, that if he would turn in his 335 shares of bank stock at $125.00 per share, or a total of $41,875.00, that he (we) would give him Combined Metals stock at 50 cents per share, or a total of 83,750 shares, he suggesting an even number of shares, 85,000, which was agreed to. An assessment on the bank stock was levied in the meantime, of which he was notified by telephone Thursday, May 26th, and he accepted the above deal and said he would charge the assessment off, that is, if we would pay the assessment he would return 33,500 shares of stock, being $16,750.00 worth of stock at 50 cents per share, leaving him a balance of 51,000 shares.

"I gave him a counter proposition of being willing to accept that if he would purchase an additional amount of 42,918 shares (making a total of 94,418) in payment for which we would accept a Pioneer Sugar Co. note for $21,459.00 payable Nov. 15, 1921, and that if this proposition was accepted I would agree to in turn purchase 15,000

shares of Combined Metals Stock from him at 50 cents per share (which would leave him a balance of 17,418) in payment for which I would sell him my equity in our home at 1795 15th East, including an amount of furniture equal to that included in the sale of Mr. Bastian's home on Harvard Avenue. The understanding being that the price of home and furniture is to be $11,500.00; $7,049.00 of this amount still being due W. C. Price, the original owner, payable in monthly installments, and that I am to assume monthly payments or otherwise settle with Mr. Price to a point where the indebtedness on the house to him is reduced to $4,000.00, it being understood that I am at liberty to make any arrangements with Mr. Price that I may choose to pay Mr. Price the $3,049.00 sooner, with the understanding that payments on the $4,000.00 should not be due before one and one-half or two years. This was accepted by Mr. Bastian, who however, asked that the amount be made even, making the balance 80,000 shares instead of 79,418. It is understood that the stock is to be free from assessments as long as it is held and owned and in the name of Bastian or J. C. Jensen.

"G. S. Bastian.
"J. C. Jensen."

The contract is referred to as "Exhibit B." Bastian alleged that such was the only agreement had between the parties. He further alleged that when the contract was entered into he was the owner of the bank stock and the sugar company note and denied all allegations of misrepresentation. He admitted that the bank stock and note and other securities were theretofore acquired by him from Woolley in consideration of Bastian conveying to him a ranch, and that, in certain litigation commenced long after the bank stock and the sugar company note in accordance with Exhibit B had been by Bastian delivered to plaintiffs, a settlement was made between him and Woolley, whereby the ranch was conveyed back to Bastian and the securities received from Woolley by Bastian delivered back to Woolley, except the bank stock and the sugar company note, and otherwise denied all the allegations in the complaint with respect thereto. Bastian further alleged that prior to entering into the contract between himself and plaintiffs, the plaintiffs made investigations to ascertain the value of the bank stock and

of the sugar company note, that the plaintiffs themselves procured the services of bankers, financial experts, and accountants to examine into the condition of the Idaho State Bank and to make a detailed investigation with respect to the note, its collectability, and as to the value of such bank stock and note, and as a result of such investigations, and not otherwise, the plaintiffs entered into the contract with Bastian; that in pursuance of the contract Bastian transferred and delivered to the plaintiffs the bank stock and the sugar company note, and did and performed all things and conditions on his part to be done and performed; that the plaintiffs issued to Bastian a certificate of stock for 80,000 shares of the capital stock of the metals company; and that the plaintiffs treated and regarded themselves as the owners of the bank stock and of the sugar company note and Bastian as the owner of the certificate of stock for 80,000 shares of the capital stock of the metals company and held Bastian out as the owner of such certificate of stock. Bastian further alleged that on the residence described in the contract and turned over to Bastian by Jensen, there was unpaid on the purchase price and due the legal owner from Jensen, the sum of $7,049.96, of which Jensen, by the terms of the agreement entered into between the plaintiffs and Bastian, agreed to pay $3,049, and thereby reduce the unpaid purchase price to $4,000, and to make arrangement with the owner that the balance of the unpaid purchase price need not be paid for 1½ or 2 years; but that Jensen failed to perform his agreement in such respect and failed to pay any of the installments on the original purchase price, and because of such nonpayment the owner foreclosed and sold the premises, as in such case made and provided, whereby the premises were wholly lost to Bastian, to his damage in the sum of $7,500.

Bastian thus prayed judgment against the metals company for the 80,000 shares of the capital stock of that company for their value and a judgment against Jensen for $7,500.

The plaintiffs filed a reply to the counterclaim, in which they admitted entering into the contract Exhibit B, but alleged that after that contract, "June 1, 1921, was signed," and on June 4, 1921, "said contract was by mutual agreement rescinded and there was returned to said defendant Bastian the said stock and said note"; that on June 5, 1921, "said securities were again delivered by said defendant to said plaintiffs to investigate as to the value of said securities," but three days thereafter the plaintiffs informed Bastian that the bank stock was worthless and the note of doubtful value; that it was then agreed that the plaintiffs should continue their investigation and in the event the securities should turn out to be worthless they were to be replaced by the conveyance and delivery of other property or securities equal in value to the amount for which "said securities were being taken in trade by said plaintiffs, and that the defendant would look to Woolley for redress on account of such failure of value in respect to the bank stock and note"; that thereafter, and before January 1, 1922, the plaintiffs advised Bastian that the note was worthless, and thereupon it was agreed by and between the plaintiffs and Bastian that he would endeavor by bringing suit against Woolley to secure redress from him, and would try to rescind his contract with Woolley, and try to recover the ranch back theretofore deeded by Bastian to Woolley, and if he succeeded in having the ranch property returned, the bank stock and note should be returned to Woolley; "and that the plaintiffs should receive in lieu thereof a proportionate interest in the ranch property, and upon the failure of Bastian to replace the bank stock and the note with property or securities of the value as theretofore alleged, the contract between the plaintiffs and Bastian should be rescinded, and the plaintiffs be under no obligation to transfer or deliver" any of the stock of the metals company.

The plaintiffs further replying denied that the contract entered into between the plaintiffs and Bastian "was other than as alleged in their complaint," and averred that there

was a "total failure of consideration" for the promise of plaintiffs to deliver to Bastian 80,000 or any number of shares of the capital stock of the metals company, and that Bastian "never had title to said bank stock and said Pioneer Sugar Company note."

To the reply Bastian filed a general and a special demurrer and a motion to strike, on the grounds that the reply stated no defense to the counterclaim; that it is inconsistent with and contrary to the complaint, was a departure from the cause as alleged in the complaint, and an enlargement thereof; and was a new, different, and distinct cause of action from that stated in the complaint. The demurrers and motion were overruled, the court however "ordering" that the reply, instead of being treated as a reply, "will be treated as an amendment to the complaint." Bastian answered the reply or amendment by denying all of the subsequent agreements therein alleged, and averred that by sections 4874, 5113, 5811, and 5813, Comp. Laws Utah 1917, relating to the statute of frauds, the alleged subsequent agreements were invalid and averred that they were without consideration.

Sanders, who by plaintiffs was made a party defendant, filed an answer, in which he alleged that he is the owner of the sugar company note by reason of a settlement made between Bastian and Woolley whereby Bastian (more than a year and a half after he had transferred and delivered the sugar company note to plaintiffs) assigned to Woolley all his right, title, and interest in and to the note, which assignment was by Woolley assigned to Sanders. He prayed that if the contract entered into between plaintiffs and Bastian was not rescinded or canceled, and if the plaintiffs were required to deliver to Bastian the 80,000 shares of the capital stock of the metals company, that Sanders be given a pro rata share of such stock.

Woolley also was made a party defendant. He alleged that in an action brought by Bastian against him January

3, 1922, a settlement was had between himself and Bastian November 4, 1922, whereby it was stipulated that their contract (long prior thereto fully executed and performed) should be rescinded and canceled, Bastian to surrender to Woolley all that he had received from him, except the sugar company note which, being in the hands of the plaintiffs and under garnishment, could not be released by plaintiffs, whereupon Bastian made a written assignment to a trustee for Woolley's use and benefit whereby Bastian released all his right, title, and interest in and to the note, and that Woolley was to convey and conveyed the ranch back to Bastian; but that Bastian failed to deliver to Woolley the bank stock or the note. Woolley thus prayed that the 80,000 shares of the capital stock of the metals company be impressed with a trust in his favor, that he be adjudged the owner of such stock, and that the plaintiffs be required to deliver it to him. There were other parties who by plaintiffs were also made defendants; the plaintiffs alleging they asserted unfounded claims, as did Woolley and Sanders, in and to the stock of the metals company and the note. Some of these answered; others not. In view of the findings and of no complaint on their part, their pleadings need not be noticed.

The case was tried to the court as one in equity. Findings were made in favor of the plaintiffs. The substance of them is: On May 6, 1921, Bastian and Woolley entered into a contract, by the terms of which Bastian conveyed a ranch to Woolley, in consideration of which Woolley transferred and delivered to Bastian the bank stock and sugar company note and other securities; that on May 26, 1921, the plaintiffs and Bastian entered into what the court called a "provisional contract or understanding," by the terms of which the metals company agreed to deliver to Bastian 80,000 shares of its treasury stock for the bank stock and the sugar company note; that Bastian "represented and stated to plaintiffs that the bank stock and note were good,

that plaintiffs would be able to obtain through their sale a sufficient amount of money with which to build a certain pilot plant"; that the metals company "undertook" to sell and deliver to Bastian 15,000 additional shares of its capital stock which Jensen "undertook" to purchase from Bastian by transferring to him Jensen's equity in his residence at Salt Lake City; that on June 4, 1921, Bastian demanded of the plaintiffs a return of the bank stock and of the note, which, in pursuance of the theretofore "provisional contract," were delivered to plaintiffs by Bastian, and which were thereupon returned to him, "and the said provisional contract or understanding was rescinded by mutual consent"; but that on the next day the plaintiffs and Bastian "re-entered into said provisional agreement or understanding and all the terms thereof and the bank stock and note were thereupon again delivered to the plaintiffs by Bastian." Then the court found that it was further agreed between the "parties at the time of the delivery of said bank stock and note to the plaintiffs" that "the consummation of said agreement or undertaking should in the meantime remain in suspense, and that Jensen accordingly went to Twin Falls, Idaho, to conduct an investigation, and learned that the bank was in financial difficulties and the value of the stock was doubtful"; that because an assessment of 50 per cent was levied on the stock on or about May 26, 1921 (amounting to $16,750), and to avoid a stockholder's liability thereon if it should be determined that the stock was without value, Jensen, on or about June 8, 1921, borrowed sufficient money with which to pay the assessment on short-time notes and to secure the payment of them deposited the bank stock as collateral security, but that the bank stock was thereafter sold under such collateral and became entirely lost; that during such investigations and negotiations Bastian was kept informed by plaintiffs and made no objections thereto and acquiesced therein; that at the time of the levy of the assessment the bank was insolvent and its stock of no value; that the sugar company

note also was without value, but that "the plaintiffs in their own interest and in the interest of Bastian made prolonged and vigorous efforts to realize upon said sugar company note but without success."

The court then made findings with respect to the commencement of an action by Bastian against Woolley, January 3, 1922, about eight months after their contract had been fully executed and performed, in which Bastian alleged that the bank stock and the note were valueless, that the value thereof was misrepresented to him by Woolley, and sought a rescission of the contract theretofore entered into between them; that negotiations of settlement were had by them whereby the contract was rescinded, the ranch conveyed back to Bastian, and the securities which Bastian had received from Woolley were to be returned to him and to become his property, and that during such negotiations Bastian asserted that all of the securities received from Woolley were at Bastian's disposal; that Woolley became the owner of such securities, but Bastian was unable to obtain the sugar company note from the plaintiffs because of writs of garnishment, whereupon Woolley took an assignment from Bastian of all his right, title, and interest in and to the note and waived the return to him of the bank stock; and that Woolley thereafter made an assignment of the sugar company note to Sanders.

Findings were made with respect to the other defendants to the effect that they had no right, title, or interest in or to the stock of the metals company or the note as against plaintiffs. No findings were made with respect to the subsequent agreements alleged in the reply. All that the court found as to the Salt Lake City residence is "that Bastian got possession of it," and of the furniture, "and has never returned either," and that the metals company "gave Jensen credit of $7,500 without any consideration except to make him whole in said transaction, and that the said Bastian was not damaged thereby."

Judgment was rendered and entered: "That the contract or understanding of exchange entered into between plaintiffs and defendant Bastian on the 1st day of June, 1921, and rescinded on the 4th day of June, 1921, by mutual agreement of the parties and again re-established on the 5th day of June, 1921, be, and the same is hereby, rescinded and canceled;" that the 80,000 shares of the capital stock of metals company is the property of that company and that "none of the parties to this action have any right, title, or interest therein"; that the bank stock is the property of Woolley and the sugar company note the property of Sanders; and that none of the parties was entitled to anything by their counterclaims.

From the judgment Bastian alone appeals. There is no Cross-appeal nor cross-assignment of error by any of the other parties. The appeal relates wholly to the controversy between the plaintiffs and Bastian with respect to the 80,000 shares of the capital stock of the metals company and damages against Jensen resulting in the loss to Bastian of the residence because of Jensen's failure to pay in accordance with his agreement the unpaid original purchase price thereof. None of the other defendants claim any interest in or to the residence. As to the stock of the metals company, the court having adjudged and decreed that none of them had any right, title, or interest therein, and none of them taking an appeal or making any cross-assignment of error, all of such defendants must be treated as acquiescing in and as being content with the judgment that none of them had any right, title, or interest in or to the stock of the metals company.

The principal assignments made by Bastian relate to the court's refusal to strike from the complaint and reply the allegations respecting the action commenced by Bastian against Woolley and the settlement made thereof between them, as being irrelevant and in no way connected with or as affecting the contract entered into between the plain-

tiffs and Bastian; overruling Bastian's demurrers to plaintiffs' reply and refusing to strike it on the grounds stated in the demurrers and in the motion; admitting in evidence over Bastian's objections testimony of contemporaneous parol agreements at variance with Exhibit B admittedly entered into by and between the parties; admitting in evidence over Bastian's objections testimony of parol agreements made subsequent to Exhibit B and long after Bastian had performed all of the terms and conditions thereof on his part to be performed; admitting in evidence over objections of Bastian testimony relating to numerous and divers other matters; insufficiency of the evidence to support the findings and in many specified particulars material to the cause as being either against the evidence or against the clear and manifest weight of it; finding and adjudging that the metals company and not Bastian was the owner of the 80,000 shares of the capital stock of the metals company; and the refusal of the court to grant Bastian any relief on his counterclaim.

The record is voluminous—consisting of more than 500 printed pages of the abstract. Of necessity it is impracticable to set forth the evidence in detail. In the course of this opinion we shall refer only to so much of the substance of the evidence thought by us to be material in the consideration of the assignments considered by us.

In the complaint of plaintiffs it is in effect alleged that a completed and executed contract was entered into by and between the plaintiffs and Bastian. As therein alleged, the terms of the contract in substance are that Bastian agreed to transfer and deliver to the plaintiffs 335 shares of stock of the State Bank of Idaho and a promissory note of $21,450.75 of the Pioneer Sugar Company, in consideration of which plaintiffs agreed to deliver to Bastian 80,000 shares of the capital stock of the metals company and to transfer to Bastian Jensen's equity in his residence. The terms of the contract, as so alleged, in effect are the same as con-

tained in Exhibit B. It also is alleged in the complaint in effect that the contract was performed by Bastian by transferring and delivering to plaintiffs the bank stock and the note. That was all, by the terms of the alleged contract, Bastian was required to do. Such alleged contract, by the complaint, is sought to be rescinded on the ground of misrepresentations by Bastian as to the value of the bank stock and the note.

It, however, was further alleged in the complaint that, about 17 months after the contract was entered into by and between plaintiffs and Bastian and the bank stock and note transferred and delivered to plaintiffs, Bastian in an action brought against Woolley made a settlement with him, whereby Bastian agreed to transfer and deliver back to Woolley the bank stock and the note together with other securities which he had received from Woolley, and Woolley to convey the ranch back to Bastian; but as the bank stock became valueless Bastian was not required to deliver back such stock, and as the note was in the hands of plaintiffs subject to writs of garnishment the note could not be and was not delivered up by plaintiffs, whereby Bastian made an assignment to Woolley of all his right, title, and interest in and to the note, by reason of which transactions, and of Bastian's conduct in such respect, it is alleged, Bastian rescinded the contract existing between him and plaintiffs. To put the proposition concisely, it is this: If one by a valid written contract sells, transfers, and delivers to another property or a chose in action, and thereafter makes an assignment to a third person, who is in no way connected with the contract and has no interest therein, of all his right, title, and interest in or to the property or chose in action, such constitutes a rescission of his contract with such other. Needless to say for apparent reasons such a position is untenable. The plaintiffs do not allege that they were parties to the transactions had between Bastian and Woolley, that they in any particular were connected therewith, or had anything to do with the transactions, or in what way such

transactions were of any concern to them, or in what particular they could be bound or affected by negotiations had between Bastian and Woolley in which the plaintiffs had no participation or concern. All such allegations with respect to such transactions, and in manner as alleged in the complaint, in no sense constituted a rescission of the contract between the plaintiffs and Bastian and as to them fully performed by him, and ought to have been stricken as being irrelevant, and the substance of the complaint regarded as one for a rescission of the contract as alleged in the complaint on the ground of the alleged misrepresentations.

Now, as to the reply filed by the plaintiffs to Bastian's counterclaim: Bastian, by his counterclaim, declared on Exhibit B, alleging full performance on his part by transferring and delivering to the plaintiffs the bank stock and the note and as by the contract provided, and as having performed all of the terms and conditions thereof on his part to be performed, failure of the plaintiffs to deliver to him the 80,000 shares, or any part thereof, of the capital stock of the metals company, and failure of Jensen to pay the legal owner the original purchase price of the residence as by the contract Jensen had agreed to do. The plaintiffs in their reply in effect averred that the contract entered into by and between them and Bastian was by mutual agreement rescinded June 4, 1921; that on the next day the bank stock and note were delivered back to the plaintiffs, not with the understanding that the contract was re-established as found by the court, but merely to enable plaintiffs to investigate the value of such stock and note; that within three days thereafter plaintiffs notified Bastian that such stock and note were worthless, whereupon, it is alleged, it was further agreed that the plaintiffs should continue such investigation, and if it should be found (which they alleged they already knew) that the stock and note had no value, then Bastian was to replace such stock and note with other securities; and when plaintiffs further indicated to Bastian that such stock and note were valueless, that it then was still further

agreed that Bastian should commence an action against Woolley to recover the ranch, and if successful, plaintiffs were to receive a proportionate interest in the ranch in lieu of the stock and note.

Thus in the complaint there was alleged a completed and existing contract between the plaintiffs and Bastian, which by this action was sought to be rescinded on the alleged ground of misrepresentations as to the value of the bank stock and sugar company note transferred and delivered to plaintiffs in pursuance of the contract. In the reply, it in effect is alleged that such contract by mutual agreement between the parties was rescinded (June 4, 1921), and thus no longer existed. Hence what was asked to be rescinded in the complaint was, in the reply, alleged to have been rescinded long prior thereto. Still, notwithstanding such allegations, the plaintiffs in their reply further alleged that the contract existing between them and Bastian "was as alleged in their complaint," but that Bastian never had title to the bank stock or to the note, and that there was a total failure of consideration for any promise made by plaintiffs in such contract. The reply thus was not only inconsistent within itself, but stated a different cause, on a different theory, on a different ground, and on a different contract from that stated in the complaint, and was a complete departure therefrom. It, of course, is familiar doctrine that where allegations of a declaration are repugnant to and inconsistent with each other, they thereby neutralize each other and render the declaration bad on general demurrer; that a cause of action alleged in an amended petition, though founded on the same grievance or injury as that described in the original, is a different cause of action, if it is dependent upon different grounds for holding the defendant responsible for the wrong alleged; and that the power of a court to permit an amendment of a pleading does not authorize an importation which in effect introduces a new or different cause of action. *Hancock* v. *Luke*, 46 Utah 26, 148 P. 452; *Johnson* v. *Amercian S. & R. Co.*, 80 Neb.

255, 116 N. W. 517; *Kirton* v. *Atlantic Coast Line R. R.*, 57 Fla. 79, 87, 49 So. 1024; *Herlihy* v. *Little*, 200 Mass. 284, 86 N. E. 294; *Altpeter* v. *Postal Tel. Cable Co.*, 26 Cal. App. 705, 148 P. 241; *Blair* v. *Brailey* (C. C. A.) 221 F. 7.

The record shows that on June 1, 1921, the plaintiffs and Bastian entered into contract Exhibit B. There is no dispute as to that. While the parties, of course, had prior bargainings and negotiations back and forth with respect thereto, yet all such and all contemporaneous oral agreements were merged into that contract, which on June 1 was written out in longhand and then signed. It is conceded that Jensen in all of the transactions had with Bastian acted, and was authorized to act, for the metals company; that the contract, though in his name alone, was for the use and benefit of the company as well as for himself; and that he on behalf of the company and of himself transacted and conducted substantially all of the transactions had with Bastian. No claim is made, nor is there any evidence to show, that the contract entered into June 1 was on terms other than or different from those contained in the contract signed that day. That such contract was a completed contract, and when made then expresed all the rights and obligations of the parties with respect thereto, is not disputed by any one. At that time Bastian transferred and delivered unconditionally to Jensen the bank stock and the sugar company note referred to in the contract. That is not disputed. The metals company stock was not then delivered to Bastian. Thereafter, and after discussing the matter with his counsel, Bastian, on June 4, 1921, expressed dissatisfaction with the bargain and asked Jensen to return the bank stock and the note to him. Jensen, and Bastian and his attorney, discussed the matter back and forth the greater part of the night, and as a result thereof the bank stock and the note were delivered back to Bastian. On the next morning, June 5, 1921, Jensen, unsolicited by Bastian, visited him at his home to induce him to reconsider the matter, urged that Bastian had been influenced too much by his counsel, and, after much per-

suasion and argument with Bastian and his wife, Jensen induced Bastian to go on with the deal. Thereupon the contract of June 1 was reaffirmed and re-established and the bank stock and the note again unconditionally delivered back to Jensen.

It, however, is at this point where the contentions of the parties are at variance; Bastian contending that the contract of June 1, and reaffirmed on June 5, expressed the whole bargain between the parties and stated all the terms of the contract; the plaintiffs while admitting that the contract of June 1 was reaffirmed and re-established on June 5, yet assert that it then was also orally agreed that the contract was not to become operative until the plaintiffs had investigated and ascertained the value of the bank stock and of the sugar company note and that the stock and the note were delivered back to them only for such purpose. In other words, it is the contention of the plaintiffs that the real contract between the parties then became partly in writing as expressed in Exhibit B and partly oral. Manifestly, the plaintiffs cannot prevail on such theory, either as matter of law or on the record as matter of fact. When the testimony of such additional oral agreement was offered, Bastian's objections thereto were overruled. We think the court erred in the ruling. The doctrine is familiar that when parties put their negotiations into writing, in such terms as import a legal obligation, and on its face a completed contract, without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole of the engagement of the parties and the extent and manner of their undertaking have been reduced to writing, and that parol evidence is not admissible to vary or contradict the terms of such writing or add or substitute new or different or additional terms. *McCornick* v. *Levy*, 37 Utah 134, 106 P. 660; *Vance* v. *Heath*, 42 Utah 148, 129 P. 365; *Midgley* v. *Campbell Bldg. Co.*, 38 Utah 293, 112 P. 820; 2 Williston on Contracts, § 633; 10 R. C. L. 1018; 13 C. J. 771.

No claim is made that Exhibit B is ambiguous or uncertain, and for such reason it was necessary or permissible to resort to parol evidence to ascertain the meaning and intention of the parties as expressed and intended by the writing. Then, too, the claim of any such oral agreement is inconsistent with the complaint of plaintiffs, wherein the terms of the contract entered into between the parties are alleged substantially as contained in Exhibit B, and not otherwise.

Further, the evidence does not support, and is contrary to, the claim of any such oral agreement. The plaintiffs, when they entered into and signed Exhibit B June 1, 1921, then knew that an assessment has been levied on the bank stock of 50 per cent of the par value of the stock amounting to $16,750, which assessment by the terms of Exhibit B the plaintiffs assumed and agreed to pay. The plaintiffs themselves so allege in their complaint. The evidence shows the plaintiffs, prior to entering into the contract, had ample means and opportunity to investigate the value of the bank stock and of the sugar company note. With full knowledge that an assessment had been levied on the bank stock of $16,750 prior to June 1, 1921, yet, after the bank stock and note had been delivered back to Bastian, on June 4, it was the plaintiffs and not Bastian who manifested a keen desire to go on with the deal, and who through Jensen the next morning, wholly unsolicited and uninvited by Bastian, with much argument and persuasion induced Bastian to go on with the negotiations as embodied in Exhibit B. Upon such bank stock and note being delivered back to Jensen, the record shows without dispute that he immediately went to Twin Falls, Idaho, there had the stock transferred to him in his own name, there borrowed from bankers and business men in Twin Falls $16,750 on his short time notes with which to pay, and paid, the assessment, and pledged the stock as collateral security for the payment of such notes. That was on June 8, 1921, and after Jensen on his own investigation had

been fully advised as to the financial condition of the bank. He returned to Salt Lake City, and on June 10, 1921, Exhibit B, which theretofore had been written out in longhand and signed, was written out in typewriting word for word and figure for figure and again signed by Bastian and Jensen. When the notes which Jensen had given in Idaho matured, plaintiffs got an extension of time in which to pay them and pledged the sugar company note as additional security. When that time expired and the notes were not paid, the absolute title, and all right, title, and interest in and to the bank stock under the terms of the pledge were acquired by the pledgees in payment of the notes and the sugar company note returned to plaintiffs. In view of all this and in view that Woolley many months prior thereto admittedly had sold and transferred the bank stock to Bastian, who in turn sold, transferred, and delivered the stock to plaintiffs, who in turn had the stock transferred in Jensen's name and pledged it to secure the payment of their notes and the absolute title to the stock acquired by the pledgees in payment thereof, the finding and judgment of the court that Woolley still was the owner of such stock are incomprehensible, especially in view of the settlement between Woolley and Bastian November 4, 1922, whereby Woolley indisputably, and as plaintiffs in their complaint alleged, waived the return of such stock to him. In such circumstance it is inconceivable of any finding that Woolley still was the owner of such stock. That the plaintiffs had the stock transferred in the name of Jensen and on June 8, 1921, pledged it to secure the notes on which he borrowed money with which to pay and paid the assessment is wholly inconsistent with plaintiff's allegation in the reply that the stock was delivered to plaintiffs only for investigation and that three days after June 5, 1921, when the stock was redelivered to them, they notified Bastian that such stock was "worthless and was a liability instead of an asset." It is highly improbable that any one finding and believing that the stock then was "worthless and a liability" would at the

same time borrow $16,750 on his notes to pay the assessment, be able to pledge the stock in payment of the loan, and when the notes matured obtain an extension of time in which to pay them and pledge additional security for such payment.

The payment of the sugar company note when delivered to plaintiffs was secured by notes or contracts which farmers had given or made to the sugar company for payment of beet seed obtained by them from the company and to be paid or deducted from money to be paid them ■ for beets. In July, 1921, the plaintiffs, in pursuance of their contract with Bastian, issued and delivered to him a certificate for 80,000 shares of the capital stock of the metals company. The certificate as issued was not free from assessments as by Exhibit B it was provided the stock should be free from assessments, whereupon Bastian returned the certificate to the plaintiffs to have it modified and changed accordingly. The plaintiffs readily assented thereto and agreed to fix the matter up. The metals company accordingly convened its board of directors, and on July 28, 1921, the board unanimously adopted a resolution:

"That the deal with Gearsen S. Bastian be approved and that the stock issued to him be authorized and that any assessments on such stock be paid by the company so long as it is in the name of Gearsen S. Bastian and J. C. Jensen and directly owned by them."

But before the new certificate free from assessment was delivered to Bastian, plaintiffs were served with writs of garnishment against Bastian. The sugar company note in the hands of plaintiffs was not then due. It was due and payable November 15, 1921. Up to the time the writs were served, no claim was made by plaintiffs that Bastian was not the absolute owner of the bank stock or the note when they on June 1 were delivered and on June 5, 1921, redelivered to plaintiffs. There is not a scintilla of evidence in the record to support the allegation of plaintiffs in their

reply that Bastian was not then the owner of the stock and note. All the evidence shows that he then was the absolute and undisputed owner and holder of them. Notwithstanding that, the plaintiffs, without any basis whatever therefor, averred in their reply that Bastian "never was the owner of them." Until the writs of garnishment were served, no claim was made by plaintiffs that their contract with Bastian was other than or different from that as evidenced by Exhibit B and as in efect is alleged in their complaint. Until then no claim was made that the contract between the plaintiffs and Bastian was not a completed contract, or that the delivery of the bank stock and note to plaintiffs was conditional. Until then plaintiffs treated and regarded themselves as the absolute owners of the note, and of the bank stock until it was sold on their pledge. Until then they treated and regarded Bastian as the owner of 80,000 shares of the capital stock of the metals company, and, just a few days before the writs were served, approved the deal with Bastian and authorized a certificate of capital stock of 80,000 shares of the metals company to be issue to him free from assessment.

But after the writs were served the plaintiffs began to make a somewhat different claim. They, in answer to the writs, then made the claim that the "deal" or "contract" between themselves and Bastian was not fully "consummated." And, in supplementary proceedings had before and after the sugar company note became due, Jensen and officers of the metals company testified that they expected to hold the transaction between the plaintiffs and Bastian "in status quo" until it was ascertained whether or not they were going to realize on the bank stock and on the note; that if they realized on them the 80,000 shares of the capital stock of the metals company were to be delivered to Bastian otherwise not, a claim inconsistent with the terms of Exhibit B as well as with the terms of the contract as alleged in the complaint of plaintiffs. However, Jensen, who conducted the negotiations with Bastian, in such proceedings

further testified that the deal with Bastian was "consummated"; but we have not been paid;" that the sugar company note "belongs to the Combined Metals, Incorporated, and myself jointly, and there is no transfer of that to Bastian—the question is simply that when we received the bank stock we thought that was good and found that it was not, and we feel that Bastian can recover for us on them," in his suit against Woolley. In such proceedings Jensen further testified that Bastian turned over to him and the metals company the sugar company note which was "received in part payment of the consideration to be paid Bastian on the deal between" the plaintiffs and Bastian; that failure to collect the amount of the note "does not mean that the deal" between plaintiffs and Bastian "is to be canceled"; that "simply failure to collect the note at that time I don't think would stop us from collecting from the farmers"; that if they did not collect the full amount of the note "I would not say that we are going to rescind the transaction. * * * There may be adjustments made; the deal may even be carried through just as it stands. * * * If the bank stock had not been assessed (plaintiffs knew it was assessed when they entered into the contract with Bastian and by the terms of the contract agreed to pay the assessment) or the note had been paid on the 15th (of November, 1921), of course Bastian no doubt would have had his stock delivered, but as it is, we feel that Bastian is in better position to sue Woolley than we are; in fact, we expect Bastian to do that." With the plain terms of the contract between the plaintiffs and Bastian, he to transfer and deliver and having transferred and delivered to them the bank stock and the sugar company note in exchange for the stock of the metals company, and the plaintiffs admittedly not having had anything to do or any connection with the transactions between Bastian and Woolley whereby Bastian acquired from Woolley the bank stock and the note, how Bastian could or was expected to sue Woolley for plaintiffs' benefit is rather difficult to understand. At the trial

the secretary of the metals company, and who verified the pleadings filed on behalf of the plaintiffs, in giving his testimony, was asked why the metals company on July 28, 1921 (before the writs of garnishment were served), approved the deal or contract between the plaintiffs and Bastian and the issuance to him of 80,000 shares of capital stock to Bastian if that amount of stock was not to go to him, to which the secretary answered, "I think that amount of stock at that time was supposed to go to Bastian." If that be true, the service of the writs in no way changed or modified the terms of the contract between the plaintiffs and Bastian. If the metals company stock was the property of Bastian before the writs were served, it still was his stock after the writs were served. It, however, is suggested, and there is some evidence on behalf of the plaintiffs to indicate, that when the writs were served, the plaintiffs attempted to protect Bastian against them. Though that should be true, yet because thereof the plaintiffs ought not now to be permitted to beat their shield of protection into a sword against Bastian.

There is no evidence to show that the bank stock was, as alleged in the complaint, represented to the plaintiffs by Bastian as having a value of $125 a share, or as having any stated value. No such finding was made by the court. All that the court found in such respect was that Bastian represented "that the bank stock and the note were good" and that "plaintiffs would be able to obtain from their sale a sufficient amount of money with which to build a certain pilot plant." Though it be assumed that representations in such respect were actionable, which, for apparent reasons, may well be doubted, still the court did not find that the plaintiffs in any particular relied on such representations. The evidence shows that if any such representations were in fact made, the plaintiffs in no particular relied on them, but by themselves and through others made their own investigation as to the value of the bank stock and

of the note. But the bank stock when delivered to plaintiffs had value. That is shown by the plaintiffs, three days after it was finally delivered to them, and after the financial condition of the bank had been fully investigated, borrowing $16,750 and pledging the stock as security for the loan, and the pledgees, bankers and business men of Twin Falls and familiar with the financial condition of the bank, willing to lend and lending that amount of money on the bank stock as security. While the sugar company note may not itself have had much value, nevertheless it is shown that the securities of the note were valuable; and had the plaintiffs, when they received the note and securities, notified the farmers, whose obligations were given to secure the note, of the assignment and transfer to plaintiffs, substantially the whole amount of the note could have been collected. But the plaintiffs failed to do that until after about all of the securities had become lost. The plaintiffs no doubt expected there would be no difficulty in collecting from the farmers, that the farmers would deliver their beets to the Pioneer Sugar Company, and that the company would hold out the amount due on beet contracts and turn the money over to the plaintiffs. As shown by the record, the Pioneer Sugar Company was friendly to the plaintiffs. That company, however, failed to build or acquire or operate a sugar factory, and thus was compelled to turn the beets to be received from farmers under contracts to grow beets for it over to the Amalgamated Sugar Company. No notice was given the farmers until December 3 or December 15, 1921. At that time the beets grown by the farmers had been delivered and most of their obligations paid. Demand was made on the Amalgamated Sugar Company to hold out moneys from beets which had not yet been paid. The Amalgamated Company declined to do so unless the plaintiffs put up a guaranty bond. Such a bond was furnished by the plaintiffs. Various meetings were held by the plaintiffs with farmers with a view of collecting from them. The farmers declined to pay on the ground that they had already

paid their obligations. A few declined on the ground that the Pioneer Sugar Company had not kept its contract with them. Such negotiations and efforts to collect by the plaintiffs continued until in February, 1922. In such negotiations the plaintiffs, time and time again, asserted that they were the owners and holders of the sugar company note and of the securities given for its payment. One of the plaintiff's attorneys testified that in his communications with the farmers he stated that plaintiffs were the owners and holders of the note and of the securities. Further efforts were made by the plaintiffs and their attorney to collect on the note and on the securities, not on behalf of or for Bastian, but solely on behalf of the plaintiffs. When the Amalgamated Company finally was notified by plaintiffs to hold out moneys due farmers for beets, it was notified to pay what moneys were so held out to the plaintiffs or as they directed. None of it was to be paid or go to Bastian. In March, 1922, the plaintiffs being unable to collect from the farmers without lawsuits, their attorney wrote the bonding company requesting a cancellation of the bond, and stated that—

"In connection with the bond written for the Combined Metals, Inc. and J. C. Jensen favor the Amalgamated Sugar Company, we beg to advise that these parties hold an assignment of moneys due from the farmers for beet seed furnished for the 1921 crop. The amount was supposed to be about $23,000. However, in view of the fact that notice of the assignment was not furnished to the farmers, and in view of the fact that no arrangement could be made by clients with the committee representing the farmers to secure payment in six months without litigation, all the moneys were ordered released by the Amalgamated Sugar Company to the farmers, except such as had been tied up through special suit and garnishment proceedings. Consequently no further liability can be incurred under the bond, and, so far as we are advised, no liability has been incurred to date."

On the record it thus is manifest that the sugar company note, because of these securities, had good and substantial value, and that the failure of the plaintiffs to realize there-

from was largely due to their own fault and neglect. Further, Bastian testified that no representations whatever were made by him as to the value of either the bank stock or of the note; that plaintiffs knew just as much about the value of them as he did. Jensen, who conducted the negotiations with Bastian, testified that "I don't know of Bastian saying anything about the note as to its value, anything of that kind, when I made the deal with him, further than it was secured by these farmers' notes and was to be paid off at harvest," and that the "vital thing" and "the only thing that was lacking in the matter was that we did not get the money on the note."

Thus on the record it is clear that the allegation in the complaint as to misrepresentation of value, like the allegation that Bastian was not the owner of the bank stock and of the note when he delivered them to the plaintiffs, is not supported by the evidence. It is just as manifest that when the bank stock and the note were delivered to the plaintiffs they were delivered unconditionally and in consideration of plaintiffs' delivering to Bastian 80,000 shares of the capital stock of the metals company and Jensen to transfer his equity in the residence. The record does not admit of any other conclusion. The theory thus stated in the complaint for a rescission of the contract on the ground of misrepresentation is wholly groundless. The real complaint of plaintiffs is but this: Since the bank stock was lost on their pledge to secure the loan made by them with which to pay the assessment on the stock, and which by their contract was assumed and agreed to be paid by them, and since by their neglect and fault not anything of value was realized on the sugar company note, to now require the plaintiffs to deliver to Bastian a certificate for 80,000 shares of the stock of the metals company as by their contract they had agreed to do is to require them to give up something for nothing. For that reason do the plaintiffs say there was a "failure of consideration." We have already shown that at the time of the transaction between the par-

ties, and when the bank stock and the note were delivered to plaintiffs, the stock and note had value, the stock at least of sufficient value to justify a loan on it of $16,750, and the note, because of its securities, substantially face value and no representations made by Bastian as to value. But what about the value of the stock of the metals company. The record shows its value was chiefly potential or prospective. What market value there was at the time of the transaction was shown to be from 7 to 12½ cents a share. It was not worth 50 cents a share as represented by Jensen to Bastian. However, no matter as to these comparative values. There is no proof to show that Bastian represented the bank stock or the note to be of any stated value. There is not anything appearing in Exhibit B, or by any writing, that Bastian guaranteed or warranted the stock or note as having a stated value. In the absence of fraud, no warranty or guaranty may be grafted on a written contract by testimony of any oral agreement without varying and enlarging the terms of the contract. By their contract the plaintiffs got exactly what they intended to buy and did buy without taking any warranty or guaranty. Not having taken any, they cannot have the benefit of any. The bank stock and the note were transferred and delivered in exchange for capital stock of the metals company for what they appeared on their face to be without any guaranty or warranty. That they did not prove to be of the value expected or even became substantially worthless does not constitute failure of consideration. *Allen* v. *Bissinger,* 62 Utah 226, 219 P. 539.

Page on Contracts, vol. 6, § 2873, says:

"The term 'failure of consideration' imports that the party to whom the consideration moved has not received under the contract what it was agreed that he should receive. If he receives exactly what he had contracted for, and if he stipulated originally for a thing of value, he cannot avoid the contract because it does not prove as advantageous to himself as he had anticipated or because the thing for which he bargained and which he has received proves to be substantially worthless in fact."

The cases are there cited supporting the text. *Otis* v. *Cullum*, 98 U. S. 447, 20 L. Ed. 496, is a leading case. To the same effect are the cases of *Busch* v. *Stromberg-Carlson Tel. Mfg. Co.* (C. C. A.) 217 F. 331, and *Allen* v. *Bissinger*, 62 Utah 226, 219 P. 539; Williston on Contracts, § 111; *Philpot* v. *Gruninger*, 14 Wall. 570, 20 L. Ed. 743; *Dendy* v. *Russell*, 67 Kan. 721, 74 P. 248; *Williams* v. *Hasshagen*, 166 Cal. 386, 137 P. 9.

A further claim made by the plaintiffs is that whatever contract was entered into by and between the plaintiffs and Bastian, either on June 1 or on June 5, 1921, subsequently was modified by the parties by parol agreements between them, and, as alleged in plaintiff's reply, to the effect that if the bank stock and the note turned out to be worthless it was orally agreed that Bastian should transfer and deliver to plaintiffs other property or securities; and that when Bastian was finally notified that the bank stock and the note were worthless, there was a further oral agreement that Bastian was to bring an action against Woolley to rescind his contract entered into with him, and to recover the ranch back from Woolley, and if successful, the bank stock (though long prior thereto pledged by plaintiffs and absolute title acquired by the pledgees) and the note were to be returned to Woolley, and the "plaintiffs should receive in lieu thereof a proportionate interest in the ranch property"; and on failure of Bastian to replace the bank stock and the note with other property or securities, the contract between the plaintiffs and Bastian was to be rescinded and the plaintiffs under no obligation to transfer or deliver any of the stock of the metals company. The time at which such oral agreements were entered into is not definitely alleged, some time prior to January 1, 1922, some time between June 4, 1921, and November 4, 1922. The plaintiffs, however, alleged no consideration whatever for either of such or of any subsequent agreements. Upon such ground, among others, the reply was demurred to by Bastian. When testimony was offered with respect to them,

Bastian again on such ground, among others, objected to the testimony. All these objections were overruled. No proof was given, nor was there any offered, to show any consideration whatever for such subsequent agreements. We think the objections were well taken. The authorities are substantially of one accord that when the original contract no longer is executory, or where the party, against whom the subsequent parol agreement is attempted to be asserted, had substantially performed the material parts of the original contract on his part to be performed, or where the party asserting the subsequent parol agreement was in default or had breached the original contract, the subsequent agreement, to be binding and effective requires a new or independent consideration; and when in such case no additional or different obligation or liability is imposed on the party asserting the subsequent agreement, but different and additional burdens, obligations, or liabilities are thereby imposed only on the party against whom the subsequent agreement is asserted, and not anything further with respect to a consideration is alleged or claimed, the subsequent agreement is without consideration and of no binding effect. Here, at the time of the alleged subsequent agreements, Bastian had fully performed the original contract on his part to be performed. The original contract implies a performance thereof on the part of the plaintiffs concurrent or reasonably contemporaneous with the performance on the part of Bastian. The plaintiffs failed to so perform and were in default in such respect before the writs of garnishment were served and when the alleged subsequent parol agreements were claimed to have been entered into. The parol agreements, as alleged, imposed no additional or different burdens, obligations, or liabilities on the plaintiffs other than those already imposed on them by the original contract. By the asserted parol agreements the plaintiffs were not required to do anything more or other than what they were obligated to do under the original contract, but new and additional burdens and obligations were imposed

on Bastian alone. Thus it is clear that the parol agreements to be of binding effect required a new and independent consideration; and it is just as clear that none was alleged, nor was there any proven. *Smith* v. *Brown,* 50 Utah 27, 165 P. 468; *McIntyre* v. *Ajax Min. Co.,* 20 Utah 323, 60 P. 552; notes and cases L. R. A. 1915B, 1.

Again, the original contract to be binding and enforceable, and to satisfy the statute of frauds, was required to be, as it was, in writing and subscribed by the parties sought to be charged. To alter or modify any of its material parts or terms by a subsequent agreement required one also to be in writing and so subscribed, especially the alleged agreement whereby Bastian, if successful in his litigation with Woolley, was to convey to plaintiffs an interest in and to the ranch in lieu of the bank stock and of the sugar company note. *Lincoln Realty Co.* v. *Garden City,* 94 Neb. 346, 143 N. W. 230, Ann. Cas. 1914D, 342; *Price* v. *McDowell,* 52 Okl. 608, 153 P. 649; notes L. R. A. 1917B, 141. Neither part performance nor anything done by plaintiffs in reliance on the subsequent agreements is alleged or proven by them.

And then, as already observed, there is no satisfactory evidence that the bank stock or the sugar company note was redelivered to the plaintiffs merely for investigation; but it is clearly shown that such delivery was made unconditionally and in consideration of the delivery to Bastian of the 80,000 shares of the capital stock of the metals company. Nor is there any satisfactory evidence that Bastian agreed to deliver to the plaintiffs other property or securities in lieu of the bank stock and the note. And though there were such evidence, still it must be disregarded for the reasons heretofore stated.

With regard to the alleged agreement that Bastian, if successful in getting the ranch back from Woolley, was to give the plaintiffs an interest therein in lieu of the bank stock and of the note, the great weight of the evidence

shows this: In January, 1922, Bastian brought an action against Woolley, not for rescission, but for damages based on alleged misrepresentations made by Woolley to Bastian as to the value of the bank stock and of the sugar company note. Negotiations were thereafter had between Woolley and Bastian whereby it was stipulated between them that if Bastian turned back to Woolley all the securities which Bastian had received from Woolley, except the bank stock, Woolley would convey the ranch back to Bastian. To carry out such negotiations it was necessary for Bastian to obtain the sugar company note from the plaintiffs still in their hands. Bastian thereupon proposed to the plaintiffs that if they would surrender up the note, the face value of it should be deducted from the amount of the metals company stock to be delivered to Bastian at the value of 50 cents a share. The plaintiffs declined to do that. Further propositions were made back and forth, whereby it was proposed that Bastian give plaintiffs an interest in the ranch in lieu of the note. There is some evidence to show that Bastian orally agreed to that, but could not comply therewith for these reasons: When the ranch was conveyed to Woolley, it had an incumbrance on it of $20,000 or more. This incumbrance still existed with unpaid interest and unpaid taxes, and, as Bastian claimed, additional incumbrances, in all amounting to about $40,000 or more. These had to be taken care of by Bastian to get the conveyance back. To do that he was required to create a corporation, convey the ranch to it, and deposit or pledge the whole of the capital stock for a loan with which to pay off the incumbrances. Upon Bastian's inability to give the plaintiffs any interest in the ranch, the plaintiffs then proposed to deliver up the note to Bastian subject to the garnishments, if he would release the plaintiffs from their obligations to deliver to him all or any part of the capital stock of the metals company. That Bastian declined to do and notified Woolley that he was unable to get the sugar company note from the plaintiffs and called off his negotiations of settlement with Woolley.

Thereupon Woolley proposed to go on with the deal and convey the ranch back if Bastian would give him an assignment of all right, title, and interest which Bastian had in and to the note. Such an assignment was made and the ranch conveyed back.

On this several things are claimed by the plaintiffs: First, that Bastian breached his contract with them by his failure to give them any interest in and to the ranch. Assuming such an agreement was made, yet, as has been seen, the agreement is invalid because without consideration and resting wholly on parol was within the statute of frauds. Secondly because Bastian gave Woolley the assignment, it is claimed he thereby rescinded whatever contract existed between him and the plaintiffs and estopped himself from making any claim on plaintiffs to deliver to him any part of the capital stock of the metals company. For reasons already stated, it is apparent such claim is wholly untenable.

On the record we are clearly of opinion that Bastian is entitled to recover from the plaintiffs the 80,000 shares of the capital stock of the metals company. He also is entitled to recover as against Jensen with respect to the residence. Jensen in writing agreed to convey the residence of the value of $11,000 or more with an incumbrance on it of about $7,049, of which incumbrance Jensen agreed to pay $3,049, or to reduce the incumbrance to $4,000 and to arrange for deferred payments of the balance. This Jensen failed to do, by reason of which Bastian lost all right, title, and interest in the residence. The record shows that by reason of Jensen turning his residence over to Bastian the metals company gave Jensen a credit of $7,500, but it is not shown that such credit legally may inure to the benefit of Bastian. We, however, think Bastian is entitled to a judgment against Jensen for $3,049 and interest, the amount which he had agreed to pay in part consideration of Bastian transferring and delivering to plaintiffs the bank stock and the sugar company note.

The findings of the trial court as to Bastian are therefore disapproved and set aside, the judgment reversed, and the cause remanded to the trial court, with directions to make findings in accordance with the views herein expressed, and to the effect that Bastian is entitled to recover from the plaintiffs 80,000 shares of the capital stock of the metals company or the value thereof at 10 cents a share together with interest thereon at the legal rate from June 5, 1921, until paid, and to recover from Jensen $3,049 together with interest at the legal rate from June 5, 1921, until paid, and to render and enter a judgment accordingly together with all costs incurred by Bastian in the court below and all costs incurred by him in this appeal.

THURMAN, C. J., and CHERRY, HANSEN, and GIDEON, JJ., concur.