## PAYNE et al. v. PRAY et al.
### No. 3728.

United States Court of Appeals
Tenth Circuit.
Feb. 9, 1949.

John E. Curran, of Tulsa, Okl., for appellants.

Lee B. Thompson and Paul Brown, both of Oklahoma City, Okl. (Geo. L. Verity, McInnis, Thompson & Sullivan, and Brown & Verity, all of Oklahoma City, Okl., on the brief), for appellees.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

PHILLIPS, Chief Judge.

This is an appeal from a judgment denying specific performance of a contract in an action by Payne and Herndon against Pray and Bauman.

On June 6, 1946, Magnolia Petroleum Company[1] addressed a "farm-out" letter to Payne which recited that Magnolia was the owner of an oil and gas lease covering the E ½ of the NE ¼, Section 1, Township 4 N, Range 4 W,[2] and stated that if

---

[1] Hereinafter called Magnolia.

[2] Hereinafter called the Magnolia lease.

Payne, on or before August 1, 1946, would commence the drilling of a well on the NE ¼ of the NE ¼ of such Section 1, and, on or before August 1, 1947, complete the drilling thereof to a depth sufficient to test the Bromide sand, Magnolia would assign that portion of such lease to Payne.

On June 7, 1946, the Ohio Oil Company [3] addressed a letter to Pray which stated that Pray had agreed to commence the drilling of a well, on or before July 1, 1946, in the NE ¼ of the NE ¼ of such Section 1, and to prosecute the drilling thereof with due diligence to a depth sufficient to test the Wilcox sand; that as a contribution to Pray for drilling such well, Ohio had agreed to assign to him an oil and gas lease covering the NW ¼ of the SW ¼, Section 6, Township 4 N, Range 3 W.[4]

Payne had acquired so-called "dry-hole" contribution letters which provided for the payment to him of an aggregate of $59,000, provided the well on the Magnolia lease, upon its completion, was plugged and abandoned as a dry hole.

On June 11, 1946, Payne and Bauman entered into a contract which provided that Bauman would pay Payne the sum of $3,750 in cash; that Payne would assign to Bauman all his rights under the Magnolia agreement of June 7, 1946, reserving, however, to Payne, as an overriding royalty, a ⅟₁₆th of ⅞ths of the oil and gas produced under the Magnolia lease. Bauman paid Payne the sum of $3,750.

On June 11, 1946, Payne and Bauman entered into a further contract which recited the making of the prior contract of June 11, and that, as an inducement to Bauman to drill the well on the Magnolia lease, Payne represented to Bauman that he could acquire "dry-hole" letters providing for the payment of an additional amount of $39,000. It further provided that, in the event Payne should be able to obtain from Ohio, the Sun Oil Company,[5] or any other company owning oil and gas leases in the area, any interest in leases, "bottom hole monies" or other thing of value, "as a consideration for the drilling of the well on the Magnolia" lease, such interest in leases, monies, or other thing of value should be assigned by Payne to Bauman, but that Payne should be entitled to reserve to himself, as an overriding royalty, ⅟₁₆th of ⅞ths of the oil and gas produced under such leases.

Pray completed the well on the Magnolia lease in accordance with the letter of June 6, and Payne received proper conveyance of the overriding royalties which he reserved in the oil and gas to be produced under the Magnolia and Ohio leases.

On June 14, 1946, Pray wrote a letter to Payne with which he enclosed the check for $3,750 provided for in the first agreement of June 11, and stated: "In addition to this cash you are to receive a ⅟₁₆th of ⅞ override in all of the acreage that you have obtained and on any additional acreage in which you are working on, such as Sun, Mid-Continent, etc."

Payne attempted to obtain from Sun a "farm-out" agreement with respect to its lease covering the E ½ of the E ½ of the SW ¼ of Section 6 and the N ½ of the NE ¼ of the NE ¼ of the NW ¼ of Section 7, Township 4 N, Range 3 W,[6] or a dry-hole contribution agreement with respect to the well to be drilled on the Magnolia lease. Payne also attempted to acquire from the Mid-Continent Petroleum Corporation [7] a "farm-out" agreement with respect to its oil and gas lease covering the NW ¼ of the NW ¼ and the W ½ of the NE ¼ of the NW ¼ of Section 7, Township 4 N, Range 3 W.[8] Payne attempted to secure such agreement with Sun and Mid-Continent in consideration of Pray drilling the well on the Magnolia lease, but Mid-Continent and Sun refused on the ground that the well on the Magnolia lease was too far distant from their respective leases. Information derived from the drilling of the well on the Magnolia lease would not have been of material value in determining whether oil or gas would be found on the Frankenberg lease or on the Myers lease.

---

[3] Hereinafter called Ohio.
[4] Hereinafter called the Ohio lease.
[5] Hereinafter called Sun.

[6] Hereinafter called the Frankenberg lease.
[7] Hereinafter called Mid-Continent.
[8] Hereinafter called the Myers lease.

The Frankenberg lease and the Myers lease each provided that it should expire unless the drilling of a well was commenced thereon on or before November 13, 1946.

Pray and Bauman commenced the drilling of the well on the Magnolia lease on June 22, 1946. During September, 1946, they encountered showings of oil and gas in the Pennsylvania and Hunton lime formations. On October 24, 1946, they drilled into a large oil-bearing sand, known as the Bromide sand, and became convinced that the well would result in a substantial commercial producer from the Bromide sand at a depth of about 10,000 feet. They were advised by their geologist to acquire the Frankenberg and Myers leases and any other leases in the area. Pray immediately contacted Sun and Mid-Continent and asked Payne to contact them in an effort to acquire the leases.

On October 25, 1946, Sun entered into an agreement with Pray and Bauman whereby they agreed to commence a well on the Frankenberg lease on or before November 6, 1946, and to continue the drilling thereof until they had completed a conclusive test in the Bromide sand by their well on the Magnolia lease; that upon the completion of such test on the Magnolia lease, they might elect either to abandon or continue the drilling of the well on the Frankenberg lease; that in the event they elected to continue such well, they should enter into a "farm-out" agreement with Sun requiring them to continue the drilling of such well on the Frankenberg lease with due diligence to a depth sufficient to thoroughly test the Bromide sand, and that such "farm-out" agreement should reserve in Sun an overriding royalty of 1/16 th of all oil and gas produced on the Frankenberg lease and an "oil payment" of $100,000 out of an additional 1/16th of all oil and gas produced under such lease, the oil payment not to mature until Pray and Bauman had recovered from their part of the oil and gas produced under such lease, as development costs, $250,000 for each well drilled on the lease.

Pursuant to such "farm-out" agreement, Pray moved a string of rotary drill equipment onto the Frankenberg lease and commenced the drilling of a test well thereon and completed the same as a commercial producer in the Bromide sand at a cost of approximately $250,000.

On October 28, 1946, Mid-Continent and Pray entered into an agreement whereby it agreed to assign to Pray the Myers lease with respect to 60 acres of the total 170 acres covered thereby and, in consideration thereof, Pray agreed to commence the drilling of a well on the 60-acre tract on or before November 8, 1946, and to prosecute the drilling thereof to a depth sufficient to test the Bromide sand. Pray drilled such well at a cost of approximately $250,000, and received an assignment out of the Myers lease of 60 acres thereof.

The well on the Magnolia lease was completed January 31, 1947, to a depth sufficient to test the Bromide sand. However, mechanical difficulties were encountered in the drilling thereof and the well was plugged back as a producer in the Hunton lime formation.

The trial court found the foregoing facts and further found that, prior to the time the agreements of October 25 and October 28, 1946, were entered into with Sun and Mid-Continent, respectively, the efforts of Payne to procure agreements with Sun and Mid-Continent as a consideration for the drilling of the well on the Magnolia lease had failed; that the only service which Payne performed with respect to the agreements of October 25 and October 28 was an arrangement for conferences between Pray and Sun, and Pray and Mid-Continent; that the agreement of October 25 with Sun was not entered into as a consideration for the drilling of the well on the Magnolia lease, but that the consideration therefor was the drilling of the well on the Frankenberg lease, a 1/16th overriding royalty, and a $100,000 oil payment; that the agreement of October 28 was not entered into as a consideration for the drilling of the well on the Magnolia lease but for the consideration of the drilling of the well on the Myers lease which Pray completed at a cost of approximately $250,000; that Pray and Bauman offered in open court to pay Payne and Herndon, in cash, such amount as the court should adjudge was reasonable for the services rendered in arranging the conferences with Sun and Mid-Continent;

that Payne and Herndon rejected the offer; and that the well on the Magnolia lease was not drilled as a "tight-hole" and that before the contracts of October 25 and October 28 were entered into, Sun and Mid-Continent had obtained the information derived from the drilling of the well on the Magnolia lease to the Bromide sand.

On December 26, 1946, Payne wrote a letter to Pray in which he enclosed royalty deeds and stated they covered interests Pray was to assign to him on the Ohio lease and the Myers lease.

Pray returned the letter with the notations: "You haven't sent me the correct originals. * * * Please date assignments on both Hinkle & Myers—October 26th, 1946." The court found the reference in the notation to the Myers lease was inadvertent and that Pray and Bauman at all times contended that the assignments to them of the Frankenberg lease and part of the Myers lease were not made as a consideration for drilling the well on the Magnolia lease.

The court concluded that the second contract of June 11, 1946, was not ambiguous and that Payne and Herndon were not entitled to an overriding royalty in the Frankenberg lease and that portion of the Myers lease acquired by Pray.

■ The findings of the trial court find substantial support in the evidence and the inferences which may be reasonably drawn therefrom. They are not clearly erroneous and are, therefore, binding on this court.[9]

■ The second contract of June 11, 1946, and especially that part with respect to overriding royalties in oil and gas produced from interests in leases which Payne might obtain from Ohio, Sun, or any other company "as a consideration for the drilling of the well on the Magnolia" lease was complete, clear and unambiguous. Extrinsic evidence was not admissible to vary its terms or explain the meaning thereof.[10] It could not be altered, except by another contract in writing, or an executed oral agreement.[11] It follows that Pray's letter of June 14, 1946, was not admissible, either as an aid to interpretation or for the purpose of varying the terms of the second contract of June 11, 1946.

■ In order to bring an interest in a lease secured by Payne within the terms of such contract, the interest must have been obtained as a consideration for the drilling of the well on the Magnolia lease. It is clear from Pray's letter of June 14, and from recitals in the contract, that the parties hoped and expected that Payne would be able to obtain from Sun, Mid-Continent, and other owners of leases in the area surrounding the well on the Magnolia lease, interests in such leases as a consideration for the drilling of such well. Payne did endeavor to obtain the Frankenberg and Myers leases as a consideration for the drilling of the well on the Magnolia lease, but failed in that effort. After the well on the Magnolia lease had been completed into the Bromide sand on October 24, 1946, and Pray and Bauman and their geologists were convinced it would be a large commercial producer, Pray and Bauman entered into contracts for the assignment to them of the Frankenberg lease in consideration of the drilling of a well on such lease at a cost of approximately $250,000, a $\frac{1}{16}$th overriding royalty, and a $100,000 oil payment, and they entered into a contract for the assignment to them of a portion of the Myers lease in consideration of the drilling of a well on that lease at a cost of approximately $250,000.

It seems plain to us that the drilling of the well on the Magnolia lease was not the consideration for either of such assignments.

The judgment is accordingly affirmed.

[9] Harris v. National Machine Works, 10 Cir., 171 F.2d 85, 90; McElroy v. Pegg, 10 Cir., 167 F.2d 668, 670.

[10] Eagle Printing & Publishing Co. v. Chandler, 116 Okl. 108, 243 P. 237, 239; Delk v. City Nat. Bank of Duncan, 85 Okl. 238, 205 P. 753, 754; Combined Metals v. Bastian, 71 Utah 535, 267 P. 1020, 1027; Embden State Bank v. Boyle, 50 N.D. 573, 196 N.W. 820, 822.

[11] 15 Okl.St.Ann. § 237.